IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WILLIAM J. MOYLE, | ) | |
| | ) | Case No. 8:12-cv-434 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CONCRETE INDUSTRIES, INC., ROGER T. | ) | |
| CLARKE, and NEBCO, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT, OR IN THE
ALTERNATIVE, FOR A NEW TRIAL**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................ii

**MOTION FOR RELIEF FROM JUDGMENT**...................................................................1

Background .........................................................................................................................1

Argument............................................................................................................................4

          A.  Applicable Law ........................................................................................4

          B.  Plaintiff is a Nebraska Citizen under 28 U.S.C. §1332 ...........................6

          C.  Defendants are entitled to relief from the void Judgment.................16

Conclusion........................................................................................................................18

**ALTERNATIVE MOTION FOR A NEW TRIAL OR REMITTITUR** ..........................19

Applicable Standards........................................................................................................19

Argument

      I.        PLAINTIFF'S COUNSEL'S IMPROPER CONDUCT ENSURED A JURY VERDICT BASED ON BIAS AND SYMPATHY ................................................20

          A.  References to NEBCO's size and wealth during Opening Statements ...........21

          B.  Accusations of hiding documents known to be irrelevant ...............................21

          C.  Improper attacks against Defendants' expert witness ......................................24

          D.  Making arguments during Opening Statements, suggesting eye witness was influenced by defense counsel, improper references to defense counsel, and repeatedly raising matters excluded by the Court................................................35

          E.  Improperly making pleas for empathy during Closing Argument, making improper attacks on defense counsel, and again referencing the wealth of Defendants................................................................................................................36

          F.  Plaintiff's counsel's improper attacks resulted in an excessive Verdict based on bias, prejudice, passion and sympathy ...............................................................37

G.  Failure to object to each and every act of misconduct does not impact the result where Plaintiff's conduct permeated the entire trial, resulted in a Verdict based upon bias, sympathy, and prejudice, and affected Defendants' substantial rights .................................................................................................38

H.  Standard for a new trial .................................................................................39

I.  Application of the law to counsel's improper conduct....................................40

II.  DEFENDANTS ARE ENTITLED TO A NEW TRIAL ON THE GROUNDS THAT THE COURT ERRED IN CERTAIN LEGAL RULINGS ...................................48

A.  Professional Negligence Instruction.................................................................49

B.  Instruction on the Laws of Physics...................................................................56

C.  Exclusion of Simulations .................................................................................58

D.  Plaintiff's "Calendar" .....................................................................................63

III.  DEFENDANTS ARE ENTITLED TO A NEW TRIAL, OR ALTERNATIVELY, A REMITTITUR, BECAUSE THE DAMAGES AWARDED ARE NOT SUPPORTED BY THE EVIDENCE .................................................................................................66

A.  The jury unreasonably failed to consider Plaintiff's comparative fault ..........66

B.  The damages awarded are not supported by the evidence and are the result of passion and prejudice by the jury, accordingly, Defendants are entitled to a new trial, or alternatively, a remittitur...................................................................75

1. The evidence at trial does not support the Verdict..............................75

2. Applicable law...................................................................................80

3. Analysis ............................................................................................82

CONCLUSION……………………………………………………………………………91

Defendants Concrete Industries, Inc., Roger T. Clarke, and NEBCO, Inc. (collectively, "Defendants") have submitted a Motion for Relief from Judgment, or in the Alternative, for a New Trial.  Defendants are entitled to relief from the Judgment pursuant to Federal Rule of Civil Procedure 60(b)(4) on the grounds that the Judgment is void for lack of subject matter jurisdiction.   In the alternative, should this Court deny Defendants' Rule 60(b)(4) Motion, Defendants are entitled to a new trial, or a remittitur.  Defendants are entitled to a new trial due to the improper conduct of Plaintiff's counsel in this case, which likely caused an excessive Verdict to be rendered on the basis of bias, passion, and undue prejudice.  Defendants are also entitled to a new trial due to several improper rulings that cumulatively resulted in prejudice to Defendants.  Finally, Defendants are entitled to a new trial because the Verdict is not supported by the evidence.  Alternatively, Defendants are entitled to a remittitur.  In support of their Motions, Defendants submit the following Brief.

## MOTION FOR RELIEF FROM JUDGMENT

### BACKGROUND

On October 31, 2012, at approximately 3:06 p.m., Roger T. Clarke ("Clarke") was operating a 1999 Mack Truck, driving northbound on U.S. Highway 75 in Cass County, Nebraska, in the scope of his employment with Concrete Industries, Inc.  (Amended Complaint, docket no. 27, ¶ 9; Answer to Amended Complaint, docket no. 32, ¶ 8; Exhibit 1, Moyle Depo. at 51:3-68:25).  On that same date, at the same time, William J. Moyle ("Plaintiff") was driving a 2000 Ford F450 northbound on U.S. Highway 75 in Cass County, Nebraska, in the scope of his employment with Mechanical Systems, Inc.  (Amended Complaint, docket no. 27, ¶ 8; Answer to Amended Complaint, docket no. 32, ¶ 8; Exhibit 2, Clarke Depo. at 131:1-136:25).  Plaintiff was driving behind Clarke and was "gaining on him."  (Exhibit 1, Moyle Depo. at 90:7-92:11).

1

A collision occurred between the two vehicles as they approached the intersection with Highway 34.  (Stipulation, Jury Instruction No. 12).

On December 19, 2012, Plaintiff filed a Complaint (docket no. 1) against Defendants, Concrete Industries, Inc. and Clarke in the United States District Court for the District of Nebraska.  In the Complaint, Plaintiff alleged that he was "a citizen and resident of Missoula, Montana."  (Complaint, docket no. 1, ¶ 1).  The Complaint also alleged that "[t]his Court has jurisdiction under 28 U.S.C. §[]1332 because [Plaintiff] is a citizen and resident of the State of Montana, and both [Clarke] and [Concrete Industries, Inc.] are citizens and residents of the State of Nebraska, and the amount in controversy exceeds $75,000 exclusive of interest and costs." (Complaint, docket no. 1, ¶ 5).

Defendants Concrete Industries, Inc. and Clarke filed an Answer (docket no. 11) on January 16, 2013.  The Answer stated that Concrete Industries, Inc. and Clarke lacked sufficient information to admit or deny whether Plaintiff was a citizen and resident of Missoula, Montana. (Answer, docket no. 11, ¶ 1).  The Answer also stated that Concrete Industries, Inc. and Clarke lacked sufficient information to admit or deny whether the parties were diverse such that this Court had subject matter jurisdiction under 28 U.S.C. § 1332.  (Answer, docket no. 11, ¶ 5). Thus, Concrete Industries, Inc. and Clarke denied the existence of diversity jurisdiction in their Answer.  *See* Fed. R. Civ. P. 8(b)(5) ("A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial.").

On July 10, 2013, Plaintiff filed an Amended Complaint (docket no. 27), which added NEBCO, Inc. as a Defendant.  In the Amended Complaint, Plaintiff again alleged that he was "a citizen and resident of Missoula, Montana."  (Amended Complaint, docket no. 27, ¶ 1).  The

2

Amended Complaint also alleged that "[t]his Court has jurisdiction under 28 U.S.C. §[]1332 because [Plaintiff] is a citizen and resident of the State of Montana, and both [sic] [Clarke] and [Concrete Industries, Inc.] and [NEBCO, Inc.] are citizens and residents of the State of Nebraska, and the amount in controversy exceeds $75,000 exclusive of interest and costs." (Amended Complaint, docket no. 27, ¶ 6).

Defendants filed their Answer to the Amended Complaint (docket no. 32) on July 30, 2013. In their Answer to the Amended Complaint, Defendants stated that they lacked sufficient information to admit or deny the allegation that Plaintiff was a citizen and resident of Missoula, Montana. (Answer to Amended Complaint, docket no. 32, ¶ 1). The Answer to the Amended Complaint also stated that Defendants lacked sufficient information to admit or deny whether the parties were diverse such that this Court had subject matter jurisdiction under 28 U.S.C. § 1332. (Answer to Amended Complaint, docket no. 32, ¶ 6). Thus, Defendants denied the existence of diversity jurisdiction in their Answer to the Amended Complaint. *See* Fed. R. Civ. P. 8(b)(5) ("A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial.").

On August 6, 2013, Defendants' counsel took Plaintiff's sworn deposition testimony. (Exhibit 1, Moyle Depo. at 1:10-1:11). Subsequently, a jury trial was held from January 21, 2014 to January 28, 2014. (Text Entries, docket nos. 88-94). The jury deliberated briefly on January 29, 2014, and then rendered a Verdict (docket no. 102) for Plaintiff and against Defendants. On February 3, 2014, this Court entered Judgment (docket no. 108) in favor of Plaintiff and against Defendants in the amount of $19,607,486.00, plus an undetermined amount of taxable costs. Defendants now move this Court for relief from the Judgment pursuant to

Federal Rule of Civil Procedure 60(b)(4), on the grounds that the Judgment is null and void due to lack of subject matter jurisdiction.

## ARGUMENT

### A. Applicable Law

Pursuant to 28 U.S.C. § 1332, a district court has subject matter jurisdiction of any civil action where the amount in controversy exceeds $75,000, and is between citizens of different states. Thus, "'[d]iversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff.'" *Yeldell v. Tutt*, 913 F.2d 533, 537 (8th Cir. 1990) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978)). Any person may challenge the existence of diversity jurisdiction at any time. *See Janzen v. Goos*, 302 F.2d 421, 424-25 (8th Cir. 1962); *see also Russell v. New Amsterdam Cas. Co.*, 325 F.2d 996, 998 (8th Cir. 1964) (finding no diversity jurisdiction on appeal after trial was held in the district court and judgment was entered against the defendant). Thus, a defendant cannot waive a challenge to subject matter jurisdiction by failing to raise the defect sooner. *See Yeldell*, 913 F.2d at 537; *see also United States v. Corrick*, 298 U.S. 435, 440 (1936) (remanding case with instructions to dismiss due to lack of diversity jurisdiction, even though it was never raised by the parties below). In fact, the Eighth Circuit Court of Appeals has noted that there may be times where a full trial on the merits must be held before a determination can be made as to the existence of diversity jurisdiction. *See Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

The existence of diversity of citizenship is determined at the time the suit is instituted, and not when the cause of action arose. *Yeldell*, 913 F.2d at 537 (citing *Smith v. Snerling*, 354 U.S. 91, 93 n.1 (1957)); *see also Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir.

2005).  "For purposes of diversity jurisdiction, the terms 'domicile' and 'citizenship' are synonymous."  *Yeldell*, 913 F.2d at 537; *see also Russell*, 325 F.2d at 998.  The Eighth Circuit Court of Appeals has stated:

> To acquire a domicil of choice, the law requires the physical presence of a person at the place of the domicil claimed, coupled with the intention of making it his present home.  When these two facts concur, the change in domicil is instantaneous.  Intention to live permanently at the claimed domicil is not required.  If a person capable of making his choice honestly regards a place as his present home, the motive prompting him is immaterial.

*Janzen*, 302 F.2d at 425 (quoting *Spurgeon v. Mission State Bank*, 151 F.2d 702, 705-706 (8th Cir. 1945)).  Thus, a person is domiciled where they reside so long as the person has no plans to go somewhere else.  *See Holmes v. Sopuch*, 639 F.2d 431, 433 (8th Cir. 1981); *see also Maple Island Farm v. Bitterling*, 196 F.2d 55, 58-59 (8th Cir. 1952) (explaining that there is a rebuttable presumption that "where a person actually lives is his domicile").

Stated another way, "a change in domicile requires only the concurrence of (1) physical presence at the new location with (2) an intention to remain there indefinitely, or the absence of any intention to go elsewhere."  *Holmes*, 639 F.2d at 433 (citing 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3613, at 728-29 (1975)).  Thus, a person is domiciled somewhere if that person intends "to reside [there] indefinitely with no present or fixed intent to move on upon the happening of a reasonably certain event."  *Id.* at 433-34; *see also Valentine v. Powers*, 85 F. Supp. 732, 736 (D. Neb. 1948) (noting that a person with "a place of fixed present habitation" is domiciled there if they have "the intention of remaining there for an indefinite time").  This inference "is not nullified by the circumstance that the person involved may entertain a floating intention to return to an earlier domicile at some future, but uncertain and indefinite, period."  *Valentine*, 85 F. Supp. 732 at 736.  A party may only have one domicile at a time.  *See Janzen*, 302 F.2d at 423-25.  "Once acquired, a person's domicile

5

persists until a new one is acquired; it is presumed to continue until it is shown to have changed." *Id.* at 434 (citing *Janzen*, 302 F.2d at 425). Furthermore, "[a] United States citizen who has no domicile in a state is 'stateless' and destroys diversity jurisdiction." *Damon v. Groteboer*, 937 F. Supp. 2d 1048 (D. Minn. 2013) (citing *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 826 (1989)).

"Statutes conferring diversity jurisdiction upon the federal courts are to be strictly construed." *Janzen*, 302 F.2d at 424 (citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Indianapolis v. Chase National Bank*, 314 U.S. 63, 76 (1941); *Healy v. Ratta*, 292 U.S. 263, 270 (1934)). "Consequently, 'if a plaintiff's allegations of jurisdictional facts are challenged by the defendant, the plaintiff bears the burden of supporting the allegations by competent proof.'" *Id.* (quoting *Thomson*, 315 U.S. at 446). A plaintiff must prove all jurisdictional facts by a preponderance of the evidence. *Id.*; *Yeldell*, 913 F.2d at 537 (explaining that the party seeking the federal forum has the burden to prove jurisdiction by a preponderance of the evidence). A district court's "'determination of citizenship for the purpose of diversity is a mixed question of law and fact, but mainly fact.'" *Altimore*, 420 F.3d at 768 (quoting *Blakemore v. Mo. Pac. R.R. Co.*, 789 F.2d 616, 618 (8th Cir.1986)).

## B.  Plaintiff is a Nebraska Citizen under 28 U.S.C. § 1332

Plaintiff's own testimony, both at his deposition and at trial, and all of the other evidence adduced at trial, make clear that Plaintiff has failed to prove that he is a "citizen and resident of Missoula, Montana," as alleged in his Complaint and Amended Complaint. (Complaint, docket no. 1, ¶1; Amended Complaint, docket no. 27, ¶ 1). Instead, Plaintiff's testimony establishes that, at the time the initial Complaint was filed and thereafter, Plaintiff was a citizen and resident of, and was domiciled in, the State of Nebraska.

6

On August 6, 2013, Defendants' counsel took Plaintiff's deposition.  (Exhibit 1, Moyle Depo. at 1:10-1:11).  Plaintiff testified that he was presently living at his parents' residence's address at 708 Third Street, in Troy, Montana, about 180 miles northwest of Missoula, Montana. (Exhibit 1, Moyle Depo. at 11:4-11:8).  However, Plaintiff then set out his residential history, which made clear that Plaintiff was not, in fact, living at, or otherwise domiciled in, Troy, Montana, or anywhere else in Montana.  Specifically, Plaintiff testified that in 1993, when he was five years old, he moved with his family from Yuma, Arizona, to Troy, Montana, where he resided until he graduated from high school in 2005.  (Exhibit 1, Moyle Depo. at 17:3-18:3). There is no evidence in this record that Plaintiff has lived at his parent's residence at 708 Third Street, in Troy, Montana, where he now apparently claims to be domiciled, since he graduated from high school in 2005.

After Plaintiff graduated from high school, he moved to Denver, Colorado, where he lived and worked for six months.  (Exhibit 1, Moyle Depo. at 18:12-20:9).  Later in 2005, Plaintiff returned to Troy, Montana, where he lived with a friend for two months.  (Exhibit 1, Moyle Depo. at 20:13-20:19; 26:3-26:8).  Plaintiff then moved to Missoula, Montana, where he lived for roughly four years.  (Exhibit 1, Moyle Depo. at 20:20-22:17).  On September 4, 2008, Plaintiff obtained a Montana driver's license, using his then-address in Missoula, Montana. (Exhibit 1, Moyle Depo. at 37:13-38:10).  Despite the fact that Plaintiff moved from Missoula, Montana, in 2010, and is no longer able to receive mail at his former address in Missoula, Plaintiff never obtained a new license prior to the accident.  (Exhibit 1, Moyle Depo. at 37:13-38:10; Partial TT, Moyle, docket no. 118 at 21:18-22:12).

In 2010, Plaintiff moved to Buffalo, North Dakota, for four and a half months.  (Exhibit 1, Moyle Depo. at 22:24-25:1).  Plaintiff then moved to Escondido, California, where he lived

for one month.  (Exhibit 1, Moyle Depo. at 24:16-25:20).  At some point in 2011, Plaintiff

returned to Troy, Montana, where he again stayed with a friend.  (Exhibit 1, Moyle Depo. at

25:21-26:8).  Plaintiff remained in Troy for only two months before he moved again, and he has

not returned to Montana, except for periodic visits.  (Exhibit 1, Moyle Depo. at 25:21-26:8;

30:14-30:20).

Plaintiff then moved to Riverton, Wyoming, where he lived for four months, from July to

October of 2011.  (Exhibit 1, Moyle Depo. at 26:9-26:25).  In October of 2011, Plaintiff moved

to Fargo, North Dakota, where he lived for seven months with his friend, Chad Heller.  (Exhibit

1, Moyle Depo. at 27:9-27:25; Partial TT, Moyle, docket no. 118 at 7:19-7:20).  Plaintiff and

Heller traveled to Omaha to attend a concert, and "were blown away by the size of it," and the

skateboarding community, and they knew Omaha was the place where they wanted to be.  They

moved to Omaha, Nebraska, on July 19, 2012.  (Exhibit 1, Moyle Depo. at 28:1-28:12; Partial

TT, Moyle, at 6:17-7:3).  Plaintiff and Heller rented an apartment in Omaha, where they signed

an eleven month lease, and they were residing there together at the time of the accident.  (Exhibit

1, Moyle Depo. at 31:2-32:7).  Plaintiff also got a new local telephone number after he moved to

Nebraska.  (Exhibit 1, Moyle Depo. at 33:19-34:4).  Plaintiff planned to stay in Omaha through

the duration of his lease, and he did not have any plans after that.  (Exhibit 1, Moyle Depo. at

32:20-32:24).

On August 11, 2012, Plaintiff met his now-fiancé, Paulina Vasquez, in Omaha.  (Exhibit

1, Moyle Depo. at 28:13-28:23; Partial TT, Opening Statement, docket no. 115 at 24:2-24:13).

According to Moyle, Paulina was 90% of the reason he decided to move to Omaha.  (Partial TT,

Moyle, at 7:4-11).  He brought her home to meet his family shortly after they started dating and

he got his mother's approval.  (Exhibit 1, Moyle Depo. at 28:13-28:23; Partial TT, Opening

Statement, docket no. 115 at 24:2-24:13).  Immediately upon moving to Omaha, Plaintiff

obtained gainful employment in Omaha with Complete Carpet.  (Exhibit 1, Moyle Depo. at 57:5-

57:19; Partial TT, Moyle, docket no. 118 at 7:14-8:1).  However, Plaintiff found that "working

carpet is . . . unstable at best."  (Partial TT, Moyle, docket no. 118 at 7:14-8:10).  After meeting

Paulina, Plaintiff decided to "get a grown-up job," and to stay "in Omaha a while," so he "joined

the union and [he] started working for Mechanical Systems[, Inc.] to plot out basically a career

path."  (Partial TT, Moyle, docket no. 118 at 7:14-8:10).  Thus, Plaintiff began working for

Mechanical Systems, Inc., in September of 2012, where he planned to make a career for himself,

so he could stay in Omaha and be with Paulina.  (Exhibit 1, Moyle Depo. at 35:16; Partial TT,

Moyle, docket no. 118 at 7:14-8:10).  Plaintiff was still working at Mechanical Systems Inc. at

the time of the accident.  (Exhibit 1, Moyle Depo. at 35:16; Partial TT, Moyle, docket no. 118 at

7:14-8:10).

      After the accident on October 31, 2012, Plaintiff was hospitalized in Omaha for about a

week, until November 7, 2012, when he went to Madonna Rehabilitation Hospital ("Madonna"),

in Lincoln, Nebraska, where he was "in residence" for inpatient rehabilitation until sometime in

December of 2012.  (Exhibit 1, Moyle Depo. at 11:14-12:23).  Plaintiff's mother, Barbara

Coldwell, testified about how Plaintiff's fiancé stood by his side throughout his hospitalization,

his time in Madonna, and thereafter.  Ms. Coldwell testified that Plaintiff's fiancé would sleep on

his floor at night in Madonna and that she was a critical part of his treatment.  At some point,

Plaintiff's home furnishings were moved from his apartment in Omaha and sent to his parent's

home in Troy, Montana.  (Exhibit 1, Moyle Depo. at 149:11-149:25).  However, Plaintiff's

mother testified that Plaintiff could never return to live at her home in Troy, Montana, because it

is not handicap accessible.

After Plaintiff was released from inpatient therapy at Madonna, Plaintiff moved to a hotel in Lincoln for just "[s]hy of two weeks" while continuing outpatient treatment at Madonna. (Exhibit 1, Moyle Depo. at 11:24-13:9). Plaintiff then moved to an apartment complex in Lincoln, and he continued to receive outpatient treatment at Madonna. (Exhibit 1, Moyle Depo. at 12:20-14:9). Plaintiff resided at the Lincoln apartment for several months, and continued to reside there at the time of the deposition. (Exhibit 1, Moyle Depo. at 12:20-14:9). Plaintiff celebrated his one year anniversary with his fiancé shortly after his August 2013 deposition. (Exhibit 1, Moyle Depo. at 28:13-28:23; Partial TT, Opening Statement, docket no. 115 at 24:2-24:13). By the time of the trial, Plaintiff and his fiancé had obtained a handicap accessible apartment in Omaha, where they now reside together. (Partial TT, Moyle, docket no. 118 at 42:25-43:11).

The above facts demonstrate that Plaintiff was domiciled in Nebraska at the time the Complaint was filed on December 19, 2012. Only two facts are necessary to establish domicile—residence and an intent to remain indefinitely, or at least, no intention to leave upon the happening of a reasonably certain event. *See Holmes*, 639 F.2d at 433. A person's domicile is instantly changed the moment those two facts come together, and his domicile continues until changed again. *See Janzen*, 302 F.2d at 425 ("When these two facts concur, the change in domicil is instantaneous."). Plaintiff testified that he moved to Omaha, Nebraska, on July 19, 2012, where he signed an eleven month lease. (Exhibit 1, Moyle Depo. at 31:2-32:7). Plaintiff planned to stay in Omaha through the duration of his lease, and he did not have any plans after that. (Exhibit 1, Moyle Depo. at 32:20-32:24). Those two facts, standing alone, establish that Plaintiff was domiciled in Omaha, Nebraska, beginning in July of 2012. For Plaintiff's domicile

to change back to Montana, Plaintiff would need both a physical presence in Montana and an intent to remain there indefinitely.  Plaintiff has not proven either of those two facts in this case.

It is not entirely clear whether Plaintiff is now maintaining that he is domiciled in Troy, Montana, or Missoula, Montana.  (*compare* Complaint, docket no. 1, ¶ 1, *with* Exhibit 1, Moyle Depo. at 11:4-11:8).  However, he cannot be domiciled in both locations.  Plaintiff's Complaint and Amended Complaint allege that he is a resident and citizen of Missoula, Montana.  (Complaint, docket no. 1, ¶ 1; Amended Complaint, docket no. 27, ¶ 1).  However, Plaintiff has not resided in Missoula, Montana, since 2010, and he has not presented any facts to support a finding that he is now domiciled there.  (Exhibit 1, Moyle Depo. at 20:20-25:1).

During his deposition, Plaintiff claimed that his home address was at his parent's residence, at 708 Third Street in Troy, Montana.  (Exhibit 1, Moyle Depo. at 11:4-11:8).  However, since he graduated from high school in 2005, Plaintiff has only resided in Troy, Montana, on two occasions, during which he did not stay at his alleged residence, but rather, he stayed with a friend for approximately two months.  (Exhibit 1, Moyle Depo. at 20:13-20:19; 25:21-26:8).  Plaintiff did not establish his domicile in Troy, Montana, during either of these two month periods.  Even if he did, a new domicile was established after Plaintiff moved to Omaha, Nebraska, because he planned to remain in Omaha for the duration of his eleven month lease, and had no plans to leave.

Once Plaintiff's domicile was established in Omaha, Nebraska, the only change in domicile that could possibly have occurred would be a change to Lincoln, Nebraska.  He may have been residing in Lincoln at the time the Complaint was filed in December of 2012, in order to continue his outpatient therapy, and he planned to remain there indefinitely for treatment.  (Exhibit 1, Moyle Depo. at 137:3-141:1).  It appears that Plaintiff's domicile has since changed

11

back to Omaha; however, this fact is only relevant to the extent that it further demonstrates the lack of Plaintiff's alleged domicile in Montana.  Regardless of whether Plaintiff was still domiciled in Omaha on December 19, 2012, or whether his domicile had at that point changed to Lincoln, it is clear that Plaintiff was a Nebraska citizen on the date the initial Complaint was filed, and thereafter.  Plaintiff does not have to intend to stay in Nebraska permanently to be a Nebraska citizen for diversity purposes; however, all the facts established in pre-trial discovery and at trial suggest that Plaintiff did plan to stay.

The only two facts that Plaintiff has asserted to support his claim that he is a citizen of Montana are that: (1) Plaintiff has a Montana drivers' license; and (2) Plaintiff's home furnishings were sent from his residence in Omaha, Nebraska, to his parents' home in Troy, Montana.  At the time of the accident, Plaintiff's driver's license had an address of 941 Kern Street, Missoula, Montana.  Notably, after the accident, Plaintiff was cited for driving on a suspended Montana driver's license.[1]  (Partial TT, Arens, docket no. 117 at 11:18-12:1). Plaintiff claims that he has resolved the problems with his Montana driver's license, and that his Montana license is now valid.  (Exhibit 1, Moyle depo. at 37:13-37:24; Exhibit 3, Jeff Barnes Depo. at 107:1-107:25; Partial TT, Moyle, docket no. 118 at 22:13-22:21).  However, Plaintiff

---

[1] Although Plaintiff was not cited for this issue, Plaintiff's failure to obtain a Nebraska driver's license after thirty days of continuous residence in this state is a clear violation of Nebraska law. *See* Neb. Rev. Stat. § 60-484(1) ("[N]o resident of the State of Nebraska shall operate a motor vehicle upon the alleys or highways of this state until the person has obtained an operator's license for that purpose."); Neb. Rev. Stat. § 488(1) ("A nonresident shall not be prevented from operating a motor vehicle upon the highways of this state during the period within which he or she may lawfully operate such motor vehicle in the state under the general motor vehicle laws of this state, but in no event shall such immunity extend beyond a period of thirty days continuous residence in the State of Nebraska."); *Stanko v. Fairbanks*, No. A-92-348, 1993 WL 527877, at *2 (Neb. Ct. App. 1993) (noting that it is a Class III misdemeanor to drive a vehicle without the proper license); Neb. Rev. Stat. § 60-4,111 (same).

has produced no evidence to prove that the issues with his suspended Montana driver's license were cleared up prior to filing the Complaint.[2]

In any event, Plaintiff's possession of a Montana license with an address in Missoula, Montana, is insufficient to establish that he was domiciled in Montana at the time the Complaint was filed. This is especially true in light of the fact that Plaintiff appears to have no ties to his former Missoula address, and he is not even able to receive mail at that address. (Partial TT, Moyle, docket no. 118 at 21:18-22:12). Furthermore, Plaintiff moved to Omaha—with the intent to remain for an indefinite period of time—several years after he obtained his Montana driver's license. There is no evidence that his domicile changed, other than perhaps to Lincoln, by the time he filed the Complaint. To the extent that Plaintiff has a Montana driver's license with an address in *Missoula*, Montana, Plaintiff's possession of such a license, in violation of Nebraska law, also does not serve to establish Plaintiff's domicile in *Troy*, Montana. Any attempt by Plaintiff to obtain a Montana driver's license with his parent's address in Troy, Montana, during the pendency of this litigation, would likewise be wholly insufficient to establish any sort of domicile there.

Furthermore, the fact that Plaintiff has moved some of his belongings to his parents' home in Troy, Montana, does not establish that Plaintiff was domiciled in Troy at the time his Complaint was filed. According to Plaintiff's deposition testimony, Plaintiff had not actually physically resided at his now-alleged domicile in Troy, Montana, for over seven years before he filed his Complaint. To the extent that Plaintiff may seek to argue that, even though he had not actually resided at his parent's home for over seven years before the Complaint was filed, he

---

[2] Regardless, Plaintiff continues to be in violation of Nebraska state law for failing to secure a Nebraska driver's license. *See* Neb. Rev. Stat. § 488(1) (making it a violation of state law to operate a motor vehicle on Nebraska's highways without a Nebraska license if more than thirty days have passed of continuous residence in the state).

13

always considered himself to be domiciled there, and he always planned to return at some point, such an argument must fail as a matter of law.

First, Plaintiff's mother, Barbara Coldwell, testified at trial that Plaintiff could not return to her home to live because the home did not accommodate Plaintiff's disability. In addition, the United States Supreme Court has made clear that the fact that a person leaves a state and has "some floating intention of returning" to that state, is insufficient to prevent the new place from becoming the person's domicile. *Gilbert v. David*, 235 U.S. 561, 570 (1915) (holding that plaintiff's "floating intention of returning to Michigan after the determination of certain litigation and the disposition of his property in Connecticut" was insufficient to maintain a domicile in Michigan). Accordingly, even a claim that Plaintiff planned to return to Troy at some point after his rehabilitation or the resolution of this case would be insufficient to prevent Nebraska from becoming Plaintiff's place of citizenship for purposes of diversity jurisdiction.

Plaintiff's income tax returns make clear that after he left Missoula, Montana, Plaintiff became a resident of Fargo, North Dakota in 2011. (Trial Exhibits 251-253). Plaintiff then moved to Omaha with his friend on July 19, 2012. (Exhibit 1, Moyle Depo. at 28:1-28:12). Plaintiff obtained an apartment and signed an eleven month lease, and he intended to continue living at the apartment for the duration of the lease. (Exhibit 1, Moyle Depo. at 31:2-32:24). Plaintiff did not have any plans beyond the eleven month lease, and he planned to stay in Omaha for an indefinite period of time. (Exhibit 1, Moyle Depo. at 32:20-32:24). Upon moving to Omaha, Plaintiff obtained a new local telephone number. (Exhibit 1, Moyle Depo. at 33:19-34:4). Plaintiff also secured gainful employment in Omaha. (Exhibit 1, Moyle Depo. at 35:16; 57:5-57:19). While living in Omaha, Plaintiff started a relationship with his fiancé, and at the time of the accident, he was planning on building a life with her. (Partial TT, Moyle, docket no.

14

118 at 7:14-8:10; Partial TT, Opening Statement, docket no. 115 at 24:2-24:13).  In fact, Plaintiff

quit his job and obtained a more secure position in order to start a career so he could stay in

Omaha with his fiancé.  (Partial TT, Moyle, docket no. 118 at 7:14-8:10).  In light of all of these

facts, the evidence makes clear that Plaintiff was domiciled in Omaha, Nebraska, at the time of

the accident, not Missoula or Troy, Montana.

However, the facts demonstrate that Plaintiff's domicile probably again changed after he

was discharged from the hospital.  Specifically, Plaintiff testified that he moved to Madonna's

inpatient rehabilitation program in Lincoln, Nebraska, until sometime in December of 2012.

Plaintiff then moved into an apartment complex in Lincoln, where he planned to remain

indefinitely so that he could continue his outpatient treatment at Madonna.  Plaintiff listed his

Lincoln address on his 2012 tax return, (Trial Exhibit 254) and he continually resided in Lincoln

through the time of his deposition in August of 2013.  The Eighth Circuit Court of Appeals has

stated that "[t]he place where a man lives is properly taken to be his domicile until facts adduced

establish the contrary."  *Maple Island Farm*, 196 F.2d at 58 (quoting *District of Columbia v.

Murphy*, 314 U.S. 441, 445 (1941)).  Thus, at the time the Complaint was filed in December of

2012, Plaintiff was either domiciled in Omaha or Lincoln, Nebraska, depending upon the actual

date that Plaintiff's residency changed and was coupled with the intent to remain for an

indefinite period of time.

Plaintiff has wholly failed to meet his burden to prove that he was domiciled in Montana

at the time he filed this action.  Accordingly, complete diversity does not exist and this Court

does not have subject matter jurisdiction under 28 U.S.C. § 1332.

00580086.DOCX

### C. Defendants are entitled to relief from the void Judgment

Any judgment rendered in an action where a court lacks subject matter jurisdiction is considered void. *See Johnson v. Arden*, 614 F.3d 785, 799 (8th Cir. 2010) (quoting *Baldwin v. Credit Based Asset Servicing & Securitization*, 516 F.3d 734, 737 (8th Cir. 2008)) ("A judgment is void if the rendering court lacked jurisdiction or acted in a manner inconsistent with due process."). For this reason, Defendants move this Court for relief from the Judgment under Federal Rule of Civil Procedure 60(b)(4). Rule 60(b) provides an "exception to finality" and "allows a party to seek relief from a final judgment, and request reopening of his case" under certain circumstances. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010). Rule 60(b)(4) "authorizes the court to relieve a party from a final judgment if 'the judgment is void.'" *Id.* "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.* "[R]elief from a void judgment pursuant to Rule 60(b)(4) is not discretionary." *Baldwin*, 516 F.3d at 737 (quoting *Hunter v. Underwood*, 362 F.3d 468, 475 (8th Cir. 2004)).

The United States Supreme Court has noted that "[i]t is a fundamental precept that federal courts are courts of limited jurisdiction" and has held that the necessity of complete diversity under 28 U.S.C. § 1332 cannot be avoided through clever pleading, or otherwise. *Owen Equip. & Erection Co.*, 437 U.S. at 374. If complete diversity cannot be found at the time the Judgment is entered, a court lacks subject matter jurisdiction over the action and it should be dismissed as void. *Cf. Caterpillar Inc. v. Lewis*, 519 U.S. 61, 76 (1996) (allowing judgment to stand in case that lacked diversity jurisdiction when it was initially removed to federal court because it became diverse before judgment entered due to dismissal of non-diverse parties).

To determine whether a judgment is void for lack of subject matter jurisdiction, the Court should consider whether there is a "total want of jurisdiction" and whether any "arguable basis" for a finding of jurisdiction exists. *Kocher v. Dow Chem.Co.,*, 132 F.3d 1225, 1230 (8thCir. 1997). However, where there are absolutely no legitimate facts upon which to base a finding that the parties are diverse, there is a total want of jurisdiction, and the judgment is void. *Cf. Caterpillar Inc.*, 519 U.S. at 76; *see also Cascades Dev. of Minnesota, LLC v. Nat'l Specialty Ins.*, 675 F.3d 1095, 1098 (8th Cir. 2012) (holding that, if a district court does not have original jurisdiction through complete diversity of citizenship when a case is removed, remand to state court is required, even if final judgment has already entered); *Slater v. Republic-Vanguard Ins. Co.*, 650 F.3d 1132, 1134 (8th Cir. 2011) (same).

The Eighth Circuit Court of Appeals case, *Associated Ins. Mgmt. Corp. v. Arkansas Gen. Agency, Inc.*, 149 F.3d 794, 796 (8th Cir. 1998), is instructive. In that case, the Eighth Circuit held that a large verdict rendered by the district court after a full trial on the merits was void due to lack of diversity jurisdiction. *Id.* at 796-798. The Eighth Circuit reversed the district court after a trial and remanded the action with instructions for the district court to vacate the judgment and dismiss the action for lack of subject matter jurisdiction. *Id.* at 798. Similarly, in *Russell*, 325 F.2d at 997, the Eighth Circuit Court of Appeals held that where a plaintiff failed to prove facts at trial showing that she was diverse from the defendant corporation, the trial court's judgment should be vacated and remanded to the district court for dismissal. *Id.* at 999; *see also Russell*, 325 F.2d at 998 (finding no diversity jurisdiction on appeal after trial was held in the district court and judgment was entered against the defendant); *cf. Johnson*, 614 F.3d at 799 (reversing judgment as void due to lack of personal jurisdiction); *Printed Media Servs., Inc. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993) (same).

00580086.DOCX

In sum, Plaintiff has failed to prove any set of facts that would support a finding that he was domiciled in either Troy or Missoula, Montana, at the time the action was filed. Instead, the facts affirmatively demonstrate that Plaintiff was domiciled in Nebraska at the time he filed the Complaint. For this reason, there is not complete diversity between the parties. This failure of complete diversity destroys this Court's subject matter jurisdiction, rendering the Judgment (docket no. 108) in favor of Plaintiff and against Defendants in the amount of $19,607,486.00 null and void. Because relief from a void judgment is not discretionary, *see Hunter*, 362 F.3d at 475, Defendants are entitled to complete relief from the Judgment pursuant to Federal Rule of Civil Procedure 60(b)(4).

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court to grant their Motion for Relief from Judgment pursuant to Federal Rule of Civil Procedure 60(b)(4), and to dismiss this action due to lack of subject matter jurisdiction.

00580086.DOCX

## ALTERNATIVE MOTION FOR A NEW TRIAL OR REMITTITUR

### APPLICABLE STANDARDS

After a jury trial, "the court may, on motion, grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). For example, the district court must set aside the jury verdict where it has determined that the verdict is against the clear weight of the evidence, that it is the result of passion or prejudice, or that the verdict is excessive. *Ouachita Nat. Bank v. Tosco Corp.*, 686 F.2d 1291, 1294 (8th Cir. 1982); *see also Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) ("[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias."). Similarly, a trial court should grant a motion for new trial "[w]hen evidence is erroneously admitted or excluded or where the trial court has erred in the instructions to the jury." *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 186 (8th Cir. 1972).

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Sanford v. Crittenden Mem'l Hosp.*, 141 F.3d 882, 884 (8th Cir. 1998) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)). The Eighth Circuit Court of Appeals will review a district court's decision to grant a new trial only for a clear abuse of discretion. *Id.* (citing *Pitts v. Electro–Static Finishing, Inc.*, 607 F.2d 799, 803 (8th Cir. 1979)). Where the size of the verdict is the basis for the new trial, the Eighth Circuit's "review is extraordinarily deferential, because 'the matter is . . . for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and

which knows the community and its standards.'" *Id.* (quoting *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447-48 (8th Cir. 1961) (Blackmun, J.)).

In considering a motion for a new trial the district court "is not required to view the evidence in the light most favorable to the non-movant." *Ouachita Nat. Bank v. Tosco Corp.*, 686 F.2d 1291, 1294-95 (8th Cir. 1982). Instead, "the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" *White*, 961 F.2d at 780 (quoting *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir. 1984)); *see also Brown v. Syntex Lab., Inc.*, 755 F.2d 668, 673 (8th Cir. 1985); *Ouachita Nat. Bank*, 686 F.2d at 1294-95. Thus, a "trial court may conclude that there has been a miscarriage of justice" warranting a new trial, "[e]ven when *substantial* evidence supports [the] verdict." *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1267 (8th Cir. 1987) (alteration in original). "Great deference is to be accorded the trial judge's decision in this determination." *Brown by Brown v. Syntex Labs., Inc.*, 755 F.2d 668, 673 (8th Cir. 1985). However, a remittitur is to be granted only where the verdict is "so grossly excessive as to shock the conscience of [the] court." *Drotzmanns, Inc. v. McGraw-Hill, Inc.*, 500 F.2d 830, 835 (8th Cir. 1974).

## ARGUMENT

## I. PLAINTIFF'S COUNSEL'S IMPROPER CONDUCT ENSURED A JURY VERDICT BASED ON BIAS AND SYMPATHY

Plaintiff's counsel engaged in a pattern of improper conduct that permeated the entire trial, resulted in a biased, unfair, and prejudicial trial to Defendants, and caused the jury to render an award on the basis of passion, bias and undue prejudice.

## A.  References to NEBCO's size and wealth during Opening Statements

First, during Opening Statements, Plaintiff's counsel referred to NEBCO as a giant conglomerate, listing off NEBCO's assets to the jury for absolutely no reason except to share improper information regarding NEBCO's size and wealth.  Specifically, Plaintiff's counsel stated:

> NEBCO owns, by my count, almost 20 concrete or construction-type companies throughout the state.  They're involved in mining operations throughout the state. They own highway equipment company, manufacturing plants.  They own a surety company, insurance companies.  They own a realty group, subdivisions in various cities.  They own the Lincoln Salt Dogs minor baseball team, Haymarket Park in Lincoln, and a golf course, amongst other things.  And one of the companies they own is Concrete Industries of Nebraska City. I say "of Nebraska City" because they own various companies called Concrete Industries.  So what is Concrete Industries?  It delivers what's called ready-mix concrete.  It has a fleet of cement trucks and it drives on our public roads delivering concrete for profit.

(Partial TT, Opening Statement, docket no. 115 at 4:21-5:9).

## B.  Accusations of hiding documents known to be irrelevant

Next, during Opening Statements, as well as during trial, Plaintiff's counsel repeatedly suggested that Defendants had engaged in improper conduct by hiding documents or failing to produce documents to Plaintiff.  However, the documents to which Plaintiff's counsel repeatedly referred were completely irrelevant to any fact at issue in the case, and they were not the subject of any motion to compel.  Instead Plaintiff's counsel repeatedly referred to these irrelevant documents for no reason other than to put the idea in the minds of the jurors that Defendants had engaged in some improper and unethical behavior by hiding or destroying important and relevant documents that might shed light on the facts surrounding the accident in this case.  Plaintiff's counsel knew that these documents were completely irrelevant, and Plaintiff's counsel never once asked this Court to compel Defendants to produce those documents.  The reason for this is clear.  Plaintiff did not actually want these documents at all because Plaintiff knew they were

21

irrelevant. Instead, Plaintiff wanted to use the fact that these items were not produced to suggest to the jury that Defendants were bad actors who engaged in misconduct and tried to hide important and relevant information from the Plaintiff and the jurors.

During Opening Statements, Plaintiff's counsel stated:

Because in the course of investigating this case you're going to learn about in seven days. It's been going on for over a year. In the course of litigation, we went to Concrete Industries and NEBCO and we said, well, the federal law requires you have documentation about certain things. And we're going to learn about three documents. And we requested: You produce these documents. Because only when you get these documents can you have a clear understanding of what was going on with that vehicle the day of the incident. I just told you that.

You're going to see here this afternoon video from the area manager. He's been testified as the head boss at Concrete Industries - Nebraska City. And these records were kept in his office. And we requested them and they were produced to us. And I noticed, and we noticed, there are a lot of records missing. And we took his deposition and we asked him why. And he said he didn't know, that they were kept in his office and he assumed they'd all been given to us. We asked him to go back and find the missing documents and we've received none.

So we're talking about three types of documents. This is the vehicle inspection report. That's a crucial document.

There's two others we're going to be discussing. One is called an IFTA report. It's an international fuel tax form. When companies apply for tax credits or tax refunds, this is required. And you're going to hear that the testimony from everybody is that an IFTA report needs to be filled out every day the truck was used. Well, we should have dozens of these reports. Not one was produced. Not one.

The second type of report we requested was the vehicle inspection report. This is federally required to be filled out every day. You're going to see we're missing certain documents on certain key days, because we're going to chart with you what was going on with this vehicle for the month leading up to this accident. And we're going to ask you: Why was this truck being operated on the roadway? The third document that we used to construct what was going on is called a driver's daily log. Commercial vehicles are required to have every day by the driver a driver daily log. Tells us what vehicles they're operating, where they're going, how many miles they're putting on, information about what's happening. And you're going to see we're missing a lot of those reports too. And we asked why. And there's -- no one knows.

(Partial TT, Opening Statement, docket no. 115 at 9:1-10:18; *see also* Partial TT, Opening Statement, docket no. 115 at 30:13-31:11, again raising the issue of allegedly missing documents).

Plaintiff's counsel also brought up the issue of these allegedly "missing" or "disappearing" documents repeatedly throughout trial, knowing full well that the documents had absolutely no bearing on the case whatsoever.  (*See* Partial TT, Mannel, docket no. 116 at 55:13-56:15).  For example, witnesses testified that the document repeatedly referred to as the IFTA report, or the International Fuel Tax Agreement, is used solely for the purpose of recording how much fuel is consumed in different states so that fuel taxes collected can be apportioned between those states.  (Exhibit 4, Boone Depo. at 13:2-13:15; Partial TT, Mannel, docket no. 116 at 153:10-20).  On cross examination, Plaintiff's accident reconstruction expert witness, Chris Mannel ("Mannel"), admitted that IFTA reports contain no information about the mechanics of the vehicles being driven, and are never used by Mannel when investigating accidents involving commercial vehicles.  (Partial TT, Mannel, docket no. 116 at 153:21-154:10).  Nonetheless, throughout the trial, Plaintiff's counsel repeatedly complained that Plaintiff was not provided with copies of the IFTA reports for the concrete mixer truck that was involved in the accident.  (*See* Partial TT, Mannel, docket no. 116 at 55:13-55:18; Exhibit 5, Neemann Depo. 54:14-54:23; 68:17-69:4; Partial TT, Clarke, docket no. 120 at 72:10-72:13).

Plaintiff is not entitled to discovery of irrelevant materials.  Plaintiff's counsel never asked this Court to compel production of any documents.  Nonetheless, despite the complete irrelevance to any fact at issue in the case, Plaintiff was able to put on a show and make it appear to the jury that Defendants were somehow hiding these reports from the jury.  Plaintiff's counsel's constant allegations throughout the trial that Defendants were hiding documents,

despite knowing them to be completely irrelevant, are tantamount to blatant misconduct and prejudicial to Defendants.

Another document that Plaintiff's counsel accused Defendants of concealing is the driver's daily logs. (*See* Partial TT, Mannel, docket no. 116 at 55:20-56:1). Despite spending an inordinate amount of time trying to show that Roger Clarke either failed to complete the daily logs, or that Defendants were hiding these documents, Plaintiff's counsel again failed to show why the driver's daily logs were relevant to any fact at issue in the case. (Exhibit 5, Neeman Depo. at 61:1-65:4; Partial TT, Mannel, docket no. 116 at 36:17-39:4). In fact, this Court held that the issue Plaintiff was trying to raise with the driver's daily logs was completely irrelevant. (Partial TT, Clarke, docket no. 120 at 72:10-77:12; Partial TT, Mannel, docket no. 116 at 36:17-39:4, 43:15-43:25). Once again, knowing full well the documents were irrelevant, Plaintiff's counsel failed to ask this Court to compel Defendants to produce the driver's daily logs, and instead elected to use the absence of these documents in an attempt to show some sort of wrongdoing by Defendants.

### C. Improper attacks against Defendants' expert witness

Plaintiff's counsel took their improper conduct even further when they repeatedly attacked Defendants' motor vehicle accident reconstruction expert witness, Benjamin Railsback ("Railsback"). Plaintiff's counsel attacked Railsback from the beginning of the case and continued to berate him throughout the duration of the trial. Starting with their Opening Statement, Plaintiff's counsel improperly tried to contrast their expert, Chris Mannel, the man with an "actual job", and Railsback, the "professional witness," by stating: "Our expert is called Chris Mannel. He is a former Nebraska State Patrol. He's -- continues to teach and instruct the Nebraska State Patrol in accident reconstruction. He works for Werner Trucking, in industry.

He's not a professional witness.  He actually has a job." (Partial TT, Opening Statement, docket

no. 115 at 22:6-22:11).

Next, during cross-examination of Railsback, opposing counsel engaged in this

outrageous line of questioning:

Q. And the first place you were -- you were hired on was Knott Laboratories, correct?

A. That's correct, yes.

Q. And you described it as a consulting firm.

A. Yes, sir.

Q. Do you recall that?

A. Yes.

Q. Isn't it basically true that it is a -- an expert witness service?  They provide expert witness testimony to lawyers and companies that need expert witnesses?

A. If -- if the investigation requires testimony, that's part of our service, yes.

Q. You mentioned a little bit about the lecturing that you do.  Knott Laboratories is present at legal conferences and they have a sign or big cardboard cutout when their presenters are there that call it The Solution for Expert Witnesses or Expert Witness Solution?

A. I'm not sure if we've got that exact sign but we definitely market ourselves as a consulting company to plaintiff and defense lawyers.

Q. Okay.  And it's – that's the Knott Laboratories with the blue logo from Colorado, correct?

A. The Knott Laboratory logo, yes.

Q. And so when you -- when you go around the country lecturing -- and your lectures are on your CV, Exhibit 269 – you're lecturing to potential customers, correct?

A. Sometimes yes.

At that point Plaintiff's counsel proceeded for nearly two pages of trial testimony to ask on a one-by-one basis about a dozen or so groups to whom Railsback has given lectures, portraying those groups only as "potential customers" of Knott Laboratories. Plaintiff's counsel continued:

Q. And you have a lecture that's kind of standard and I see you've given it a couple of times. And it's on "The Persuasion of the CSI Effect." Have you given that lecture?

A. Yes, sir.

Q. Who are you trying to persuade with the CSI effect?

A. Mostly attorneys, but in part, it is part of our communication effort.

Q. Communication for whom?

A. For lawyers, judges and juries. Very -- very often the topics that I discuss are technical in nature and using animation or visualization helps me to communicate and so when I have the opportunity, I like to use animations in my presentations to help communicate more effectively.

Q. It's a powerful tool –

A. It is.

Q. -- for persuasion?

A. It is because, you know, what I say is that a picture is worth a thousand words, so an animation or a visualization is worth a million.

Q. You mention you are an accident reconstructionist; is that true?

A. Yes, sir.

Q. And you've testified pretty much across the gamut in litigation type cases as an engineer. Would you agree?

MR. DOUGHERTY: I object to the form of the question. I'm not sure what "the gamut" is.

THE COURT: Well, I'm going to sustain the objection –

MR. PATRICK CULLAN: Sure.

THE COURT: -- I don't know what that means, a gamut of the –

MR. PATRICK CULLAN: Fair.

THE COURT: -- may be -- be a little more specific.

BY MR. PATRICK CULLAN:

Q. Are you an expert in shooting incidents?

A. I have testified in a shooting incident.

Q. Skiing accidents?

A. I testified in a skiing accident.

Q. Slips, trips and falls?

A. I've testified in a slip and trip and fall case.

Q. Window-covering injuries?

A. I've testified in a window injury covering case.

Q. Snowmobiles?

A. I don't know if I've ever testified in one but I've done accident reconstruction work associated with snowmobiles.

Q. Industrial accidents?

A. I investigated industrial accidents.

Q. Product design?

A. I've investigated product design accidents, yes.

Q. Product adequate warnings?

A. To a certain extent, yes.

Q. Have you ever conducted an accident reconstruction that was not associated with litigation?

A. There are many accidents that don't go into litigation.  We've done accident reconstruction work on those, yes.

Q. Okay.  Where you were not paid by somebody who was concerned about litigation?

A. We've – we've done some consulting work on the Air France Flight 447 that crashed some time ago. We've done some work with Princess Diana's fatal vehicle accident, things like that.

Q. Have you ever investigated a fatality for the state?

A. I don't think I've ever been retained by the State of Nebraska.  I've done work for the State of Wyoming and the State of Colorado.

Q. In accident reconstruction?

A. Yes, sir.

Q. And investigating it for the state?

A. Yes, sir.

Q. Okay. Now, you mentioned and counsel pointed out and put it into evidence your testimonial list.

A. Yes, sir.

Q. You're familiar with that.  And he said you've been allowed by the court and found to be able to give such testimony.  Is that true?

A. For the most part, yes, sir.

Q. You'd agree it's the duty and responsibility of an expert witness to be unbiased?

A. To a certain extent, yes, sir.  I -- I think that we should advocate for the truth.

Q. So "to a certain extent."   To what extent should you not be unbiased?

A. Well, to the extent you should advocate for the truth.

Q. And you're required to use scientific methods and methodology?

A. Yes, I do.

28

Q. And you're required to consider all possibilities?

A. I try to, yes.

Q. You agree there are four flags that make a [sic] expert witness's opinions suspect?

A. I don't know if that's true.  I know that there are certain methodologies that I employ to investigate motor vehicles accidents and those have always been admitted.

Q. Okay.  There are red flags that will warn a jury that somebody's expert testimony is suspect.  Would you agree with that?  And you've heard that, haven't you?

A. I've heard that phrase, yes.

Q. Experts who use anecdotal evidence.  What is anecdotal evidence?

A. Anecdotal evidence would be some kind of story.  And you would have to carefully characterize what is anecdotal evidence and what is not.

Q. It's reliance on personal recollections in place of scientific, objectifiably [sic] verifiable data, correct?

A. Not necessarily, no.  I mean, the stuff that you're talking about is in a case called Newell-Rubbermaid versus Raymond Corporation –

MR. PATRICK CULLAN: Your Honor, I'd object.  He's not responsive.  Move to strike that answer.

THE COURT: Well, I think you've gone far enough with that answer.  Let's move on to something else.

BY MR. PATRICK CULLAN:

Q. What about the extrapolation of irrelevant data?  Should an expert extrapolate irrelevant data to base and support his conclusions?

A. I don't think a expert should extrapolate irrelevant data.  An expert is allowed to rely on the data that they do consider relevant.

Q. And so that's important to know what you did consider relevant so the jury can understand if you were considering evidence that was truly relevant to this case and scientifically pure, correct?

A. I think so, yes.

Q. You are Ben T. Railsback of Knott Laboratories from Denver, Colorado, correct?

A. Yes, sir. I would probably say Knott Laboratory, not "-tories," but, yes.

Q. You mentioned a case that you've testified in.  You were here all day yesterday, correct?

A. Yes, sir.

Q. You saw Dr. Jerry Sherman, who's a professor at Creighton University, testify, did you?

A. I'm not sure of the name but I think I remember his testimony, yes.

Q. The economist?

A. Yes.

Q. And you saw that he mentioned that he has been cited by the United States Supreme Court.  Do you recall that testimony?

A. I recall that testimony.

Q. You're mentioned in a few court opinions as well, are you not?

A. Yes, sir.

Q. Have you been referred to in a court opinion as, quote, the quintessential expert for hire and his opinions in this case are pure litigation constructs?

A. I think I've heard that language before.  I don't know that I would agree with it, but I've heard that language before.

Q. Have you heard this language before -- and that was from the United States federal district court in the Northern District of Ohio.  Have you heard this language before: His report utterly fails to meet the reliability requirements demanded in this court?

MR. DOUGHERTY: Judge, I'm going to object to this line of questioning.  Without some additional foundation, I mean, there's no context as to what –

THE COURT: It seems to me -- or you can – I'll allow you to bring that out on redirect examination.

30

MR. PATRICK CULLAN: I have the opinions, Your Honor, if I –

THE COURT: Well –

MR. PATRICK CULLAN: -- if you'd like.

THE COURT: I'm not going to start going back into other cases that he may have testified in to determine what the facts and circumstances were that may have given rise to a particular comment by a court.

MR. PATRICK CULLAN: Okay.

THE COURT: We just don't have the time for that.

MR. PATRICK CULLAN: Sure.

THE COURT: Let's move on.

(Partial TT, Railsback, docket no. 105 at 75:18-84:14).  Later in cross examination, Plaintiff's counsel had the following exchange with Railsback:  "Q. You made no evaluation in your report as to whether or not the steering was effective or -- safe or defective, true?  A. I didn't attempt to do that.  That's not part of my analysis.  Q. Why not?  You're an expert in everything else."  (Partial TT, Railsback, docket no. 105 at 89:14-89:18).

Throughout his cross examination of Railsback, Plaintiff's counsel essentially accused Railsback of being a "professional witness" or "witness for hire" who will say anything he is paid to say.  That is an especially unfounded accusation in light of the fact that Railsback's professional opinions do not always agree with Roger Clarke's recollection of the circumstances of the accident.  Furthermore, as this Court noted outside the presence of the jury, Plaintiff's expert witness, Mannel, is just as much of a "professional witness" as Railsback.[3]  However,

---

[3] Specifically, the Court stated:
But I -- I do think that the references to this witness which are somewhat derogatory probably are equally applicable to the experts that the plaintiff used. They are people who I've seen on many occasions.  They are involved in

Plaintiff's counsel's most flagrant disregard for the sanctity of the Court lies, not in his repeated questioning on matters that are wholly irrelevant to any fact at issue in the case, or in his attack on Railsback's character, but rather, in his explicit mischaracterization of the language used by the court in a case to which counsel attempted to refer while questioning Railsback in the above-cited cross examination.  Plaintiff's counsel made a direct misrepresentation to this Court and to the jury when he suggested that a court had referred to Railsback "as, quote, the quintessential expert for hire and his opinions in this case are pure litigation constructs."  (Partial TT, Railsback, docket no. 105 at 83:11-83:13).

The court opinion to which Plaintiff's counsel referred was setting forth the respective arguments of the parties regarding whether Railsback should be excluded as a witness in a case that did not involve a motor vehicle accident reconstruction.  In that case, the court noted:

> Raymond argues that Railsback's testimony and report should be excluded because he "is the quintessential expert for hire, and his opinions in this case are pure litigation constructs."  In opposition, Newell Rubbermaid asserts that Railsback "is a highly qualified mechanical engineer and an expert in the field of stand-up lift truck design, operation, and safety."

*Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 5:08CV2632, 2010 WL 2643417, at *2 (N.D. Ohio, July 1, 2010) (internal citations omitted).  Plaintiff's counsel's representation to this Court and to the jury that the language quoted was part of the court's findings in the above quoted case was not only improper, but it was a deliberate misstatement of the truth.  Plaintiff's counsel purported to quote from a court case that was not in evidence and that was not in any way, shape,

---

litigation all the time.  And that's just an unfair, I think, unfair characterization -- the type of work they do is the type of work that's going to take them into the courtroom and going to be analyzing facts and so forth and to in some way berate them for doing that, then you should do that with all the experts.  Your experts are just as subject to that criticism as are they -- theirs.  And I'm just not receiving that kind of evidence for any purpose.

(Partial TT, Railsback, docket no. 105 at 122:3-122:14).

32

or form relevant to the facts at issue in the case.  In fact, the *Newell Rubbermaid* case involved a product's liability claim where a woman sustained an injury to her foot when she tried to step off of a moving forklift.  *See id.* at *1-2.  The court excluded Railsback as a witness due to a lack of experience working with and testing forklifts.  *See id.* at *4-8.  Such facts are completely irrelevant to this case, and it was wholly improper and without foundation for Plaintiff's counsel to even raise the *Newell Rubbermaid* holding in this case.  However, Plaintiff's counsel did not just improperly quote from a court opinion not in evidence, but he completely mischaracterized the language as being the court's holding, when it was actually the language of defense counsel who was making an argument in resistance to Railsback's appearance as an expert witness in the *Newell Rubbermaid* case.  Plaintiff's counsel's characterization of Railsback was unfair and prejudicial, especially because Railsback has never been excluded as an expert witness in a motor vehicle accident reconstruction case, such as the one at issue here.  (*See* Exhibit 6, Railsback Affidavit at ¶ 5).

However, disparaging Railsback in Opening Statements, and during cross examination was apparently insufficient, as during Closing Arguments, Plaintiff's counsel stated:

> The defense's expert, Ben T. Railsback.  He works for Knott Laboratories, who advertises that they are your expert witness solutions.  He goes around giving presentations around the country, to who?  Experts in the field of -- or experts in the field of accident reconstruction or potential clients.  He goes around stirring up business.  He's never held a job for anyone other than Knott Laboratories.  Now, we hear all the time, on television and talk radio, about abuse in the legal system, hired gun experts, experts who come in and proffer junk science opinions.  I submit to you this is one such gentleman.  He's also been cited in several court cases –
>
> MR. DOUGHERTY: Your Honor, I'm going to object to this period of argument.  There's no evidence in the record to support these allegations.  It was attempted to gone into and the Court stopped the inquiry.  I think it's improper.
>
> THE COURT: I don't recall any testimony about he being sued in court.

MR. PATRICK CULLAN: Not sued, okay.

THE COURT: He's – let's just move on.  You can talk about your analysis of the experts but don't – I'm sustaining the objection of counsel for the defendant.

MR. PATRICK CULLAN: Okay. Thank you, Your Honor.

MR. DOUGHERTY: Could we take the chart down that has the -- Mr. Cullan's description of what kind of a witness he is?

THE COURT: I can't read it from here.

MR. PATRICK CULLAN: Quintessential expert for hire.  His methods are unscientific.  He has four red flags in his testimony in this case.

THE COURT: I'll -- you can – I'll leave the chart up.  But don't -- avoid any references at all –

MR. PATRICK CULLAN: To the mention of those cases?

THE COURT: -- to what you claim he's been subject to.

MR. PATRICK CULLAN: Okay.

THE COURT: There's no evidence here to establish that and it's improper.

MR. PATRICK CULLAN: Okay.  I submit to you he's the quintessential expert for hire.  I submit to you that his opinions are unscientific.  I submit to you that he has four red flags associated with his opinions and his testimony.  In this case, he has two objects occupying the same space at the same time.  Can't happen.

(Partial TT, Closing Argument, docket no. 123 16:6-17:25).

Once again, Plaintiff's counsel completely crossed the line when he repeatedly attacked Railsback using the language that he previously told the jury was the language a court used to describe Railsback.  Plaintiff's counsel even went so far as to suggest that Railsback had been cited critically in "in several court cases."  (Partial TT, Closing Argument, docket no. 123 16:6-17:25).  However, Railsback's expert testimony has only ever been excluded in one single case in his entire career, and that case is the completely irrelevant product's liability case that Plaintiff's counsel mischaracterized throughout the entire trial.  (See Exhibit 6, Railsback

34

Affidavit at ¶ 5).  Plaintiff's portrayal of Railsback as an expert for hire with "junk science" opinions was unfounded and improper, and it was done for no other purpose other than to ignite prejudice in the minds of the jury.  Plaintiff's counsel succeeded in his endeavor.  As will be discussed more below, the jury's Verdict was rendered on grounds of prejudice, sympathy, and bias, and not on the facts of this case.

### D. Making arguments during Opening Statements, suggesting eye witness was influenced by defense counsel, improper references to defense counsel, and repeatedly raising matters excluded by the Court

Unfortunately, Plaintiff's counsel's misconduct does not end with flaunting Defendants' wealth during Opening Statements, accusing Defendants of hiding documents known to be irrelevant, and lying to the jury about how a past court has characterized Defendants' expert accident reconstructionist.  Plaintiff's counsel's Opening Statements were so argumentative that this Court had to, not once, but twice, interrupt Plaintiff's counsel and instruct him to stop arguing his case.  (Partial TT, Opening Statement, docket no. 115 at 19:20-19:25, 28:6-28:11).  The examples of this improper argument are, unfortunately, too voluminous to set out here.  However, Plaintiff's characterization of Tom Wilmot, the sole eye witness to the accident and a complete independent third party, as having been somehow influenced by the defense was improper.  (Partial TT, Opening Statement, docket no. 115 at 20:20-21:9).  It was also improper for Plaintiff's counsel to refer to defense counsel as "a skilled defense lawyer" who will "stand up" and "tell you that everything I said was in error."  (Partial TT, Opening Statement, docket no. 115 at 30:1-3).

It was also improper for Plaintiff's counsel to continually seek to raise matters that had been excluded by the Court, including Plaintiff's repeated efforts to get in evidence regarding the ECM data retrieval device, or "black box."  (Partial TT, Mannel, docket no. 116 at 39:8-42:21;

109:17-110:25; Partial TT, Railsback, docket no. 105 at 85:1-88:2; Partial TT, Mannel Rebuttal, docket no. 121 at 12:6-14:8).  Plaintiff's counsel raised the issue numerous times, despite the fact that this Court repeatedly held that the ECM data was completely irrelevant to any fact at issue in the case.  Each time Plaintiff's counsel raised the issue, defense counsel was forced to object.  Plaintiff's counsel even went so far as to mischaracterize defense counsel as having opened the door on Mannel's cross-examination to questioning with regard to the ECM, when the transcript is clear that defense counsel never asked a question on that point.  (Partial TT, Mannel, docket no. 116 at 144:8-144:14; 182:14-182:21; 184:19-186:3; Partial TT, Mannel Rebuttal, docket no. 121 at 14:9-20:15).  Rather, without prompting, Mannel volunteered non-responsive information in an answer to a question.  (Partial TT, Mannel, docket no. 116 at 144:8-144:14; 184:19-187:23).  Plaintiff's counsel repeatedly used inappropriate tactics in an attempt to seek the admission of irrelevant evidence to confuse the jury.  Plaintiff's counsel even read portions of a deposition transcript to the jury that had been excluded by this Court.  (Partial TT, Clarke, docket no. 120 at 97:24-99:22).  Plaintiff's counsel's behavior forced defense counsel to repeatedly object and have the appearance of an attorney trying to keep information from the jury, when in reality, Plaintiff's counsel repeatedly sought to admit irrelevant evidence and continually engaged in objectionable behavior.

### E.   Improperly making pleas for empathy during Closing Argument, making improper attacks on defense counsel, and again referencing the wealth of Defendants

Perhaps the most objectionable of all of Plaintiff's counsel's conduct can be seen in his diatribe during his Rebuttal Closing Argument.  During Closing Arguments, Plaintiff's counsel stated the following:

> I think you've come to understand what we've had to deal with since October 31, 2012.  They will do anything and they will say anything to confuse you, to

mislead you, and to obviate.  They will do anything to minimize.  He - - I started writing down the word "sympathy."  I think he reached over 40 times in his closing argument:  You will not give sympathy.  You will not give sympathy.  He does that because when you do render a verdict in this case, he wants you guys all to be saying we can't give sympathy.  And you can't.  We don't need your sympathy.  Why do you think he had to say it 40 times?  We don't need your sympathy.

(Partial TT, Closing Rebuttal, docket no. 109 at 2:24-3:9).

And you don't give sympathy, but you can certainly empathize with the situation.

(Partial TT, Closing Rebuttal, docket no. 109 at 4:17-4:18).

Let me tell you -- he told you a little secret about him speeding down here today.  Let me tell you a secret, okay?  Here's a little secret.  You ready?

Mr. Dougherty is a fantastic defense lawyer.  One of the best.  Very skilled.  And sitting on a table in front of him is a tremendous amount of money in a box.  Do you see the -- see the box sitting right there, with a ton of money?  And his job is to come in here and do anything he has to do.  He'll say anything and he'll do anything to confuse you, to mislead you, and to minimize the amount of damages so you lower the amount of money of your verdict and you -- and so he can keep the money in that box for themselves.  That's what his job is.

You don't think that he knows -- he -- he switched the situation around.

(Partial TT, Closing Rebuttal, docket no. 109 at 4:23-5:11).

## F.  Plaintiff's counsel's improper attacks resulted in an excessive Verdict based on bias, prejudice, passion and sympathy

As will be discussed below, these statements, which Plaintiff's counsel made during his

Rebuttal Closing Argument, calling for sympathy, or "empathy," vilifying defense counsel, and

alluding to the wealth of Defendants, are sufficient, standing alone, to warrant a new trial.

However, these statements do not stand alone.  Instead, these statements must be considered in

context with all of Plaintiff's counsel's other improper conduct.  This improper conduct was

rampant throughout the trial, and it infected the trial to the point that the jury was prompted to

render its Verdict on the basis of passion, prejudice and bias.  A reasonable inference can be

37

drawn that the jury based its award on these improper grounds due to the fact that the jury deliberated for a very short period of time, approximately two hours, and could not have possibly considered all of the evidence before them during that period.  Furthermore, no reasonable jury could have viewed all of the evidence and could have found that Plaintiff's own negligence did not contribute to the accident.  Finally, a reasonable inference can be drawn that the jury's award was influenced by passion, prejudice, bias and sympathy, just by looking to the excessive amount of damages that were awarded—an amount greater than Plaintiff even asked for.

### G. Failure to object to each and every act of misconduct does not impact the result where Plaintiff's conduct permeated the entire trial, resulted in a Verdict based upon bias, sympathy, and prejudice, and affected Defendants' substantial rights

Defense counsel did not object to some of Plaintiff's counsel's improper statements and acts of improper conduct, only some of which are discussed above.  However, an attorney should not have to object to every such act when a record has been made that an attorney finds such conduct to be objectionable.  *See Hall v. Rice*, 117 Neb. 813, 223 N.W. 4, 7-8 (1929), *overruled on other grounds by Whitcomb v. Nebraska State Ed. Ass'n*, 184 Neb. 31, 165 N.W.2d 99 (1969) (holding that it was sufficient that defense counsel objected during one instance of plaintiff's counsel making reference to the wealth of the defendants because requiring defense counsel "to make repeated objections to each disregard of the ruling of the court" "might result in placing the defendants in a less favorable position before the jury, and thus inflict upon them a penalty for the wrongful conduct of plaintiff's counsel"); *see also Sanders-El v. Wencewicz*, 987 F.2d 483, 484-85 (8th Cir. 1993) (noting that a persistent violation of the duty to guard the jury against the influence of passion and prejudice and to assure the litigants a fair and impartial trial is "a fatal error").

In addition, where the ultimate complaint is not of the objectionable conduct itself, but rather, of the fact that Plaintiff's counsel's statements and actions caused a jury to render a Verdict on the basis of sympathy, passion, prejudice, and bias, no objection could be made until the Verdict was rendered.  Finally, even where no objection is made, a party is entitled to a new trial where the opposing party's conduct is so prejudicial as to constitute plain error that affects the substantial rights of the parties, resulted in a miscarriage of justice, or seriously affected the fairness, integrity or public reputation of the judicial proceedings.  *See Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin*, 283 U.S. 520, 521 (1931); *see also Rush v. Smith*, 56 F.3d 918, 922 (8th Cir. 1995) (holding that, despite failure to object, the trial court's comment that implied to jury that the plaintiff and witnesses gave consistent account of events incident to shooting out of racial solidarity, rather than due to their duty to tell truth, warranted grant of new trial).  Where, as here, Plaintiff's counsel's misconduct permeated the entire trial and resulted in a Verdict based on bias, sympathy, or prejudice, Defendants' substantial rights were violated.

### H.  Standard for a new trial

Improper statements made by counsel during opening statements or closing arguments "will constitute reversible error when those statements are plainly unwarranted and clearly injurious." *See id.*; *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1303 (1987) (citing *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1149 (8th Cir.1984)); *see also Pearce v. Cornerstone Clinic for Women*, 938 F.2d 855, 859 (8th Cir. 1991) ("To constitute reversible error, statements made in closing argument must be plainly unwarranted and clearly injurious.").  However, this is the standard for reversal on appeal.  The same standard does not apply to motions for a new trial, where this Court may grant a new trial for any reason for which a new trial has previously been granted in an action at law in federal court, including a finding that the verdict may have been

the result of passion or prejudice, or that the verdict is otherwise excessive.  *See Ouachita Nat. Bank*, 686 F.2d at 1294); Fed. R. Civ. P. 59(a).

Thus, "'[a] new trial should be granted where the improper conduct of counsel in closing argument causes prejudice to the opposing party and unfairly influences a jury's verdict.'" *Campos v. City of Blue Springs, Mo.*, 289 F.3d 546, 552 (8th Cir. 2002) (quoting *Alholm v. American Steamship Co.*, 144 F.3d 1172, 1181 (8th Cir. 1998))  Similarly, "[i]mproper questioning by counsel generally entitles the aggrieved party to a new trial if such questioning conveys improper information to the jury and prejudices the opposing litigant.'" *Sanders-El v. Wencewicz*, 987 F.2d 483, 484 (8th Cir. 1993) (quoting *Williams v. Mensey*, 785 F.2d 631, 637 (8th Cir. 1986)) (internal marks omitted).  Whether prejudice has resulted from opposing counsel's improper conduct during trial is a procedural question to be determined by federal law. *See Griffin v. Hilke*, 804 F.2d 1052, 1057 (8th Cir. 1986).

### I.  Application of the law to counsel's improper conduct

It is well established in the law that improper statements by counsel during opening and closing statements may serve as the basis for the grant of a new trial or the overturning of a jury verdict.  *See, e.g.*, *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 760 (6th Cir. 1980) (granting a new trial due to plaintiff's counsel's references in opening statements about the size and wealth of the corporate defendant, combined with similar statements made during trial and closing arguments, because the misconduct was so pervasive that it made a lasting impression on the jury, as evidence by the amount of the verdict); *Hershiser v. Chicago, B. & Q.R. Co.*, 102 Neb. 820, 170 N.W. 177, 179-81 (1918) (finding that statement in closing argument that defendant railroad had "millions of dollars in the treasury" and other improper remarks were grossly improper, and although objections to the statements were sustained, such fact could not

remove the poison injected into the trial, resulting in a verdict based on passion and prejudice and requiring a new trial); *see also Atlantic Coast Line R. Co. v. Kammerer*, 205 F.2d 525, 525–26 (5th Cir. 1953) (holding that opening statement in action arising out of automobile accident at railroad crossing created an atmosphere of bias and prejudice, which made it difficult for the jury to listen to the evidence with an open mind); *Harmon Cable Commc'ns of Nebraska Ltd. P'ship v. Scope Cable Television, Inc.*, 237 Neb. 871, 894-95, 468 N.W.2d 350, 365 (1991); ("[A] party may not induce a larger verdict by argument calculated to distract the jury's attention from the issues or by prejudicial statements which have no support in the evidence."); *Book v. Erskine & Sons*, 96 N.E.2d 289 (Ohio 1951) (holding statements in closing argument relating to the wealth of a party and appealing for jury sympathy tended to induce an excessive verdict, thus requiring a new trial); *cf. State v. Wade*, 7 Neb. App. 169, 175, 581 N.W.2d 906, 911 (1998) (prosecutor's statement in closing arguments for criminal action, stating, "'Don't underestimate [defense counsel]; He's good! He's got a killer off,'" were extremely prejudicial and improper and a required a new trial).

For example, in *Morrissey*, the Eighth Circuit Court of Appeals found that plaintiffs' counsel's improper statements in a wrongful death action during opening statements and closing arguments were so prejudicial as to warrant a reversal and a new trial.  *Id.* at 1303-1304. Specifically, during opening statements, plaintiffs' counsel made reference to the wealth of defendants and made other improper comments which amounted to a plea for sympathy.  *Id.* Subsequently, during closing arguments, plaintiffs' counsel made additional appeals for sympathy and "improperly suggested that the jury compare damages for the loss of [the decedent's] life to damages she would have received had she lost a limb or her eyesight." *Id.*

41

These improper statements during opening statements and closing arguments prompted the Eighth Circuit to order a new trial on the issue of damages. *Id.*

The Eighth Circuit recognized that there was likely a correlation between the extremely high $6.5 million verdict in that case and the prejudicial statements of plaintiff's counsel. *Id.* The Eighth Circuit emphasized that, "[v]iewed in isolation, the individual statements by counsel may not have been so prejudicial as to deny defendants a fair trial, but taken as a whole, . . . the cumulative effects of the numerous improper and inflammatory remarks made by plaintiffs' counsel were prejudicial." *Id.* at 1304. Thus, the Eighth Circuit held that the improper statements substantially undermined the panel's confidence that the verdicts were not the result of prejudicial statements, and should be reversed. *Id.* As in *Morrissey*, Plaintiff's counsel in this case did not make one or two isolated comments. *Cf. Stemmons v. Missouri Department of Corrections*, 82 F.3d 817 (8th Cir. 1996) ("[W]e do not believe that this one isolated remark during the closing statement affected the jury's verdict."). Instead, Plaintiff's counsel's improper statements during trial span seventeen full pages of this Brief, and Defendants have not even attempted to document all of Plaintiff's counsel's numerous improper statements herein.

With regard to Opening Statements, Plaintiff's counsel improperly alluded to NEBCO's wealth when he discussed the various companies NEBCO owns, including insurance companies, construction companies, equipment companies, manufacturing plants, and a surety company. (Partial TT, Opening Statement, docket no. 115 at 4:21-5:9). Plaintiff's counsel also informed the jury that NEBCO owns the Lincoln Salt Dogs baseball team, Haymarket Park in Lincoln (which actually is owned by the City of Lincoln), and a golf course. (Partial TT, Opening Statement, docket no. 115 at 4:21-5:9). Plaintiff then went on to discuss other assets of NEBCO, including numerous companies called Concrete Industries, and a fleet of concrete mixer trucks.

(Partial TT, Opening Statement, docket no. 115 at 4:21-5:9).  During Opening Statements, Plaintiff's counsel also accused Defendants of hiding documents and accused Defendants' expert witness of being nothing more than a professional witness for hire.  (Partial TT, Opening Statement, docket no. 115 at 9:1-10:18; 30:13-31:11; 22:6-22:11).  During cross examination, Plaintiff's counsel told this Court and the jury that a federal court had referred to Railsback as being a the "quintessential expert for hire," despite knowing that such language was never used by the court, but rather opposing counsel in a completely irrelevant product's liability case.  (Partial TT, Railsback, docket no. 105 at 75:18-84:14).  Subsequently, during Closing Statements, Plaintiff's counsel again disparaged Railsback, made pleas for sympathy and empathy, vilified defense counsel, and most shockingly, repeatedly suggested that there was "a tremendous amount of money in a box" sitting on the defense table, which defense counsel would do anything or say anything to protect from Plaintiff.  (Partial TT, Closing Rebuttal, docket no. 109 at 4:23-5:11).

"'In making the opening statements to a jury, the plaintiff is entitled to 'briefly state his claim, and may briefly state the evidence by which he expects to sustain it.'"  *Lybarger v. State, Dep't of Roads*, 177 Neb. 35, 40, 128 N.W.2d 132, 137 (1964) (quoting *Yechout v. Tesnohlidek*, 97 Neb. 387, 150 N.W. 199 (1914)).  "An opening statement is to advise the jurors concerning the question of fact involved, so as to prepare their minds for the evidence to be heard, and facts should not be stated which cannot be proved." *Id.*  However, none of the statements that Plaintiff's counsel made regarding NEBCO's various assets, regarding Railsback, or regarding Defendants allegedly hiding irrelevant documents, were relevant to any fact at issue in the case. When Plaintiff's counsel made these statements, he did not briefly state the evidence which he expected the trial to reveal, nor did he advise the jurors of the questions of fact involved in the

43

case. Instead, Plaintiff's counsel made the statements for the sole purpose of informing the jury that NEBCO was a wealthy Defendant who could afford to pay a massive judgment and to prejudice the jury against Defendants.

Courts have universally held that it is utterly improper to discuss any facts in Opening Statements unless counsel fully believes that evidence will be presented during trial to support those facts. *See, e.g., Lybarger v. State, Dep't of Roads*, 177 Neb. 35, 45, 128 N.W.2d 132, 140 (1964); *see also Union Elec. Light & Power Co. v. Snyder Estate Co.*, 65 F.2d 297, 301 (8th Cir. 1933). Nonetheless, Plaintiff's counsel raised numerous issues during Opening Statements, despite knowing that he would not be producing evidence to prove those matters during trial. For example, Plaintiff's counsel never intended to produce evidence at trial regarding the list of assets that NEBCO allegedly owns. In fact, Plaintiff's counsel told the jury that NEBCO owns Haymarket Park. However, NEBCO does not own Haymarket Park; rather, the City of Lincoln owns Haymarket Park. Plaintiff's suggestion that NEBCO owns Haymarket Park is another example of an outright lie that Plaintiff's counsel made for the improper purpose of suggesting to the jury that NEBCO is a wealthy Defendant. Intentionally supplying false information to the jury during Opening Statements can be grounds, in and of itself, for a new trial. *See id.*

In addition, references to a party's wealth during opening statements or closing arguments are plainly impermissible and prejudicial if they are not relevant to an issue in the case. *See Union Elec. Light & Power Co. v. Snyder Estate Co.*, 65 F.2d 297, 303 (8th Cir. 1933) ("To permit evidence of the wealth of a party litigant, except where position or wealth is necessarily involved in determining the damages sustained, is prejudicial error."); *see also Gearhart v. Uniden Corp. of Am.*, 781 F.2d 147, 153 (8th Cir. 1986) *disapproved of on other grounds by Lippard v. Houdaille Indus., Inc.*, 715 S.W.2d 491 (Mo. 1986) (noting statements in

44

closing arguments regarding the wealth of a defendant corporate parent would be completely irrelevant unless punitive damages were an issue in the case); *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (finding improper counsel's reference to the wealth of defendants in a wrongful death action); *Abernathy v. Union Pac. R. Co.*, No. 4:08CV04187-BRW, 2011 WL 1773087 (E.D. Ark. May 9, 2011) (holding that the plaintiff may not comment on the size, wealth, or the corporate nature of the defendant unless it is relevant for purposes other than arousing prejudice); *Robinson v. Crown Equip. Corp.*, No. 2:02CV00084-WRW, 2007 WL 2819661 (E.D. Ark. Sept. 26, 2007) ("Under federal law, evidence of a defendant's wealth is only admissible for the purpose of evaluating the amount of punitive damages."); *Estis Trucking Co., Inc. v. Hammond*, 387 So. 2d 768, 773 (Ala. 1980) (holding plaintiff's attorney's statements during closing arguments referring to supposed wealth of defendants and inviting jurors to put themselves in the place of the plaintiff was an appeal to juror's feelings and passion, and the cumulative effect of such statements was so poisonous and prejudicial to defendants that they were entitled to a new trial, regardless of any court admonition to the jury); *Nicholas v. Island Indus. Park of Patchogue, Inc.*, 46 A.D.2d 804, 361 N.Y.S.2d 39, 41 (1974) ("It was improper for plaintiff's counsel in summation to state '[t]hey're the corporations, they're the owner, they're the defendant, they've got the money, they've got the assets behind them' [because] [a]llusion to a defendant's ability to pay damages is improper."); W. E. Shipley, *Counsel's appeal in civil case to wealth or poverty of litigants as ground for mistrial, new trial, or reversal*, 32 A.L.R.2d 9 (noting that "unprovoked references in plaintiff's argument to the defendant's wealth or favorable financial situation have generally been regarded as appeals to the bias or prejudice of the jury, tending to improperly influence the decision either on the issue of liability or with regard to the amount of the verdict" and listing numerous cases that have so held); 30

45

Am. Jur. Trials 711 ("The general rule in a tort seeking only compensatory damages is that evidence of a defendant's wealth is not admissible at trial nor subject to disclosure during discovery."); *cf. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940) ("[A]ppeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them."); *Pevely Dairy Co. v. United States, 178 F.2d 363, 371 (8th Cir. 1949) disapproved of on other grounds by Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (8th Cir. 1963) (noting that references to the size and wealth of a party are inappropriate).

For example, in *Hall v. Rice*, the Nebraska Supreme Court considered whether a plaintiff's attorney's misconduct resulted in an excessive verdict against defendants. *Hall v. Rice*, 117 Neb. 813, 223 N.W. 4, 7-8 (1929), *overruled on other grounds by Whitcomb v. Nebraska State Ed. Ass'n*, 184 Neb. 31, 165 N.W.2d 99 (1969). In that case, the plaintiff's attorney "referred to [the] defendant company as a corporation without any feeling or soul three times, as a big corporation twice, as consisting of 440 stores once, as rich clients once, and to the witnesses for defendants as these New Yorkers ten times." *Id.* at 8. The Nebraska Supreme Court noted that "these matters were immaterial and furnished no proper basis for argument" and that "[s]uch tactics have been frequently condemned by the courts." *Id.* The Court stated that plaintiff's counsel's "resort to illegitimate methods tend[ed] only to arouse the passion and prejudice of the jury," and emphasized the greater importance that the administration of justice be regular and orderly. *Id.* The Court then concluded that it could not determine the influence that the improper argument of counsel had on the jury, but found that the district court's refusal to grant a new trial on the issue amounted to prejudicial error. *Id.*

The misconduct at issue in this case, viewed as a whole, far exceeds that at issue in either *Hall* or *Morrissey*. "Fairness to the parties and our system of justice dictates that 'there must be

limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice.'" *Whittenburg v. Werner Enterprises Inc.*, 561 F.3d 1122, 1128 (10th Cir. 2009) (quoting *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978)) (reversing judgment entered by the district court and remanding for a new trial where plaintiff's counsel's closing argument made appeals to prejudice and sympathy); *see also Buhrman v. Smollen*, 164 Neb. 655 (1957) (reversing judgment for a new trial where plaintiff's counsel made pleas for sympathy). Plaintiff's counsel's improper conduct in Opening Statements and Closing Arguments crossed the proverbial line that must exist in order to ensure a fair trial in the judicial system. As a result, Defendants were denied a fair trial and a reasonable inference can be drawn that the jury rendered its excessive verdict on the basis of bias, sympathy, and prejudice. No instruction to the jury could remedy this type of misconduct. *Cf. Whittenburg v. Werner Enterprises Inc.*, 561 F.3d 1122 (10th Cir. 2009) (holding that a general instruction at the close of trial stating that counsels' arguments are not evidence was insufficient to remedy improper statements in closing argument).

Just as it is reversible error to make inappropriate comments during opening and closing statements, "'[i]t is highly improper for counsel, acting in bad faith, to make statements or ask questions or engage in other conduct as to witnesses merely to prejudice his opponent's case before the jury.'" *Sanders-El v. Wencewicz*, 987 F.2d 483, 484 (8th Cir. 1993) (quoting 88 C.J.S. Trial § 162(b) (1955)). "'The misconduct of counsel may be such that its effect cannot be overcome by an admonition to the jury or by rebuke or admonition of counsel and in such case the court should grant a discontinuance, mistrial, withdrawal of a juror, discharge of the jury, or a new trial.'" *Id.* at 484-85 (quoting 88 C.J.S. Trial § 202 (1955)) (internal marks omitted).

47

In this case, Plaintiff's counsel's conduct throughout trial, and during questioning of witnesses, was intended, in large part, to prejudice Defendants' case before the jury. Plaintiff's counsel repeatedly suggested that Defendants had made certain documents disappear despite knowing those documents to be irrelevant and never asking this Court to order Defendants to produce those documents. In addition, Plaintiff's counsel stated that a federal court had referred to Railsback as "the quintessential expert for hire," knowing such language was never used by the Court. Plaintiff's counsel also repeatedly brought up irrelevant matters that had been excluded by this Court, knowing Defendants' counsel would be forced to object. Each of these tactics, taken as a whole with Plaintiff's counsel's improper conduct during Opening Statements and Closing Arguments, was designed to prejudice Defendants' case before the jury. In fact, Plaintiff's counsel succeeded. From the moment Plaintiff's counsel stood up in Opening Statements to the moment Plaintiff's counsel sat down after Closing Arguments, Plaintiff's counsel made insulting, prejudicial, and improper statements to the jury. The end result was that Defendants were denied a fair trial, and a Verdict was rendered on the basis of bias, passion, and undue prejudice, thus affecting the substantial rights of Defendants. Plaintiff's counsel's improper conduct is such that it could not be cured through an admonition to the jury, and accordingly, Defendants are entitled to a new trial. *See id.*

## II.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL ON THE GROUNDS THAT THE COURT ERRED IN CERTAIN LEGAL RULINGS

Defendants are entitled to a new trial because the Court committed prejudicial error in failing to appropriately instruct the jury, in excluding evidence that prevented Defendants' expert from being able to explain fully his opinions to the jury; and in permitting Plaintiff's counsel to use demonstrative evidence that put inadmissible evidence before the jury.

### A. Professional Negligence Instruction

On September 25, 2013, Plaintiff filed Plaintiff's Proposed Jury Instructions (docket no. 82) with the Court. Within those instructions, Plaintiff requested that this Court give the jury a professional negligence instruction. Specifically, Plaintiff requested that the Court give NJI2d Civ. 12.04, which is Nebraska's standard instruction on the duty of rendering professional and skilled trade services. Because Plaintiff alleges this to be a diversity case, the substantive law of Nebraska applies. The language in Nebraska's standard instruction states: "A (here identify profession or trade group) has the duty to use the skill and knowledge ordinarily possessed by other (here identify profession or trade group) in good standing in the (profession, trade), in the same or similar localities." 1 Neb. Prac., NJI2d Civ. 12.04. Similarly, the language in Plaintiff's proposed instruction states: "A professional driver has the duty to use the skill and knowledge ordinarily possessed by other professional drivers in good standing in their respective profession, in the same or similar localities." (Plaintiff's Proposed Jury Instructions, docket no. 82, at 48).

Defendants objected to Plaintiff's proposed instruction, but the Court charged the jury with the professional negligence instruction that Plaintiff proposed. (Court's Charge to the Jury, docket no. 97, Instruction No. 18). However, the Nebraska Supreme Court has squarely limited the types of professions which are to be categorized as professionals for purposes of professional negligence and this instruction. In *Tylle v. Zoucha*, 226 Neb. 476, 412 N.W.2d 438 (1987), the Nebraska Supreme Court defined the term profession as follows:

00580086.DOCX

> "[A profession is] a calling requiring specialized knowledge and often long and intensive preparation including instruction in skills and methods as well as in the scientific, historical, or scholarly principles underlying such skills and methods, maintaining by force of organization or concerted opinion high standards of achievement and conduct, and committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service . . . ."

*Id.* at 480, 412 N.W.2d at 440.

The Supreme Court analyzed that definition again in *Jorgensen v. State Nat. Bank & Trust Co.*, 255 Neb. 241, 246, 583 N.W.2d 331, 335 (1998). In that case, the Court held that a bank's employees, even employees who sometimes provided advice regarding retirement planning, were not professionals, and did not render professional services, because they did not have any specialized knowledge requiring long and intensive preparation. *See id.*; 583 N.W.2d at 335. The Court noted that an employee who does not hold a license, does not regularly supplement their education, and is not subject to an ethical code enforced by a disciplinary system should not be considered a professional. *See id.*; 583 N.W.2d at 335. Accordingly, the bank employees in *Jorgensen* were not subject to Nebraska's professional negligence laws.

Similarly, numerous courts have considered the issue and have held that a holder of a CDL license, or someone who could otherwise be labeled as a "professional driver" should not be referred to as such, and held to a higher standard of care than that of an ordinary driver. For example, in *Cervelli v. Graves*, 661 P.2d 1032, 1037-39 (Wy. 1983), the Wyoming Supreme Court held that a professional cement truck driver should not be subject to a higher standard of care than an ordinary driver, and accordingly, the district court did not err in refusing to instruct the jury regarding a professional standard of care. The Court held that the mere fact that a truck driver held a higher class of license did not impute to him or her a higher standard of care. Thus, the court refused to treat the case as a "professional truck driver's driver malpractice case." *Id.*

50

Similarly, in *Townsel v. Dadash, Inc.*, No. 05–10–01482–CV, 2012 WL 1403246, at *2-4 (Tex. Ct. App. Apr. 24, 2012), the Court of Appeals of Texas held that it would have been improper for the trial court to give a proposed jury instruction that "a professional tow truck driver is held to the standard of care that would be exercised by a reasonably prudent professional tow truck driver acting under the same or similar circumstances." The Texas court found that the appropriate instruction was that of ordinary care under the circumstances, which necessarily includes a consideration of a party's expertise. *Id.* at *3-4.

Again, in *Capital Raceway Promotions, Inc. v. Smith*, 322 A.2d 238, 241, 246-47 (Md. Ct. App. 1974), the Maryland Court of Appeals affirmed the district court's refusal to instruct the jury that "a professional race driver under the circumstances is held to a higher standard of care and duty than a simple ordinary driver." The Court of Appeals held that dicta from other Maryland cases "strongly indicate that neither the inexperience of a novice nor the professional experience of a truck driver affects the standard of care required of a driver." *Id.* at 246. Accordingly, the Maryland Court of Appeals held that the district court properly refused to instruct the jury that a higher standard of care should be applied to a professional driver. *Id.* at 247.

Generally speaking, courts have held that there should be no separate standard of care for a "professional driver," with the possible exception of common carriers. *Southard v. Belanger*, No. 3:12–CV–00005–M, 2013 WL 4499016, at * 11 (W.D. Kty. Aug. 19, 2013) ("Kentucky law is clear . . . that all motor vehicle drivers, with the exception of those who carry passengers for hire, are held to the same standard of care, regardless of the type or size of their vehicle."); *Rutstein v. Cindy's Trucking of Illinois, Inc.*, No. 11–CV–320–F, 2012 WL 8813611, at *5 (D. Wy. Aug. 8, 2012) ("[A]ll drivers, regardless of class, are held to the same standard of care under

the circumstances."); *Wofford v. Bonilla*, No. CIV-07-013-KEW, 2008 WL 2368726, at *3 (E.D. Okla. June 10, 2008) (declining to allow plaintiff's expert to testify regarding a higher standard of care for truck driver defendant); *Cahalan v. Rohan*, No. Civ.03-2216(PAM/RLE), 2004 WL 2065056, at *4 (D. Minn. Sept. 2, 2004) ("The law does not recognize a standard of care beyond a reasonable and prudent ordinary person standard—even for professional drivers."); *State v. Miser*, 208 P.3d 808, at *13 (Kan. June 12, 2009) (Per Curiam) (Table) (holding that the defendant, a diabetic commercial truck driver who failed to take his medication and caused an accident which resulted in two deaths and one injury, should not be held to a higher standard of care); *Rios v. Norsworthy*, 597 S.E.2d 421 (Ga. Ct. App. 2004) (holding that a truck driver was not required to check his rearview mirror to anticipate the possibility of an illegal pass, and the truck driver should not have been held to a heightened standard of care to avoid the dangerous consequences of a van driver's illegal attempt to pass the truck in a no pass zone, and thus, testimony that a "professional truck driver is expected to use his rear view/side view mirrors to be constantly aware of other vehicles in the immediate vicinity of his own tractor-trailer rig" was properly disregarded); *Blatz v. Allina Health Sys.*, 622 N.W.2d 376, 384-85 (Minn. Ct. App. 2001) (declining to hold ambulance drivers to a standard of care beyond that of the ordinary driver); *Fredericks v. Castora*, 360 A.2d 696, 697-9 (Pa. 1976) ("We decline this opportunity to develop a higher standard of care for experienced truck drivers and find that the trial court did not err in its instruction on the degree of care in the present case."); *Adley Express Co. v. Willard*, 372 Pa. 252, 93 A.2d 676 (1953) (finding trial court erred in charging the jury that a truck driver should have been operating his vehicle with a greater degree of care than is ordinarily required of motorists).

The Nebraska Supreme Court has made clear that the term "professional" is to be strictly limited to the term as it is defined in *Tylle*, 226 Neb. at 480, 412 N.W.2d at 440. A person who possesses a CDL license and operates a commercial vehicle should not be treated as a professional under the *Tylle* definition. Furthermore, courts throughout the nation agree that a professional negligence instruction should not be given in ordinary negligence cases involving commercial truck drivers. Accordingly, the jury should not have been charged as to a professional negligence standard of care, which suggested that Clarke should be held to a higher standard of care than that of an ordinary driver under the circumstances, and to do so was prejudicial error.[4]

---

[4] During Opening Statements, Plaintiff's counsel completely misstated the law on this issue. Specifically, Plaintiff's counsel stated: "When they come on board and start working as a professional driver – they're professional drivers, they'll all testify to this -- they have a higher standard and higher duty when they're on the roadways. They'll testify to that. They're professionals. Or at least they're supposed to be." (Partial TT, Opening Statement, docket no. 115 at 14:2-14:7). During Opening Statements, Plaintiff also touted defense witness Tom Wilmot to be a "professional truck driver" with special knowledge of the roads. (Partial TT, Opening Statement, docket no. 115 at 21:13-21:14). This flagrant misrepresentation of the law regarding whether the driver of a commercial truck should be held to a standard higher than that of an ordinary driver, seriously prejudiced Defendants.

During Mannel's direct examination, Plaintiff's counsel again completely misstated the law on this issue to the jury, thus ingraining the misstatement of law in the juror's minds. Plaintiff's counsel stated in a question to Mannel:

> Q. Similarly, the Court will instruct what professional negligence is, and that is a professional driver has the duty to use the skills and knowledge ordinarily possessed by other professional drivers in good standing in a profession in same or similar circumstances. When we're talking about professional duties and professional negligence, will you agree to adopt that standard?

(Partial TT, Mannel, docket no. 116 at 18:18-18:24). Defense counsel objected to this question, and the Court sustained the objection. However, this complete misstatement of the law to the jury induced the jury to hold Clarke to a higher standard of care than that of ordinary care under the circumstances.

Plaintiff's counsel again told the jury that a "professional driver" should be held to a higher standard of care during his cross examination of Mr. Clarke. Plaintiff's counsel repeatedly referred to what Clarke should know and do differently as a "professional driver" as opposed to

When a jury receives an improper instruction, a new trial may be appropriate. *See McKay v. WilTel Communication Sys., Inc.*, 87 F.3d 970, 976 (8th Cir.1996); Fed. R. Civ. P. 59. The inquiry is whether the instructions, taken as a whole, fairly and adequately represented the evidence and applicable law, and reversal is appropriate if there was an error that affected a substantial right of the moving party. *Swipies v. Kofka*, 419 F.3d 709, 716 (8th Cir. 2005); *see also* 35B C.J.S. Federal Civil Procedure § 1056 ("A new trial based on an erroneous jury instruction is granted where the instructions do not adequately state the law and a party is prejudiced by the error because the jury is likely confused or misled.").

In this case, the jury was instructed that Clarke had the duty to behave, not as an ordinary person under the circumstances, but rather as a professional driver would behave. Such an instruction was a clear misstatement of the law and, because it was such a vital instruction to the jury's understanding and treatment of the case, the erroneous instruction amounted to prejudicial

---

an ordinary driver. (Partial TT, Clarke, docket no. 120 at 66:11-66:52; 68:5-68:20; 69:7-69:9). Once again, Plaintiff's counsel's repeated misstatement of the law caused the jury to hold Clarke to a higher standard of care.

Even in Closing Arguments, Plaintiff's counsel told the jury that Plaintiff violated "professional rules applicable to professional drivers." (Partial TT, Closing Argument, docket no. 123 at 4:25-5:1). Plaintiff's counsel continued:

> And there's two standards of care. You're going to get two instructions. One is negligence. That's a -- that applies to regular drivers. And one's a professional negligence instruction, the law for professional drivers. It's undisputed that the defendants are supposed to be held to the standards of a professional.

(Partial TT, Closing Argument, docket no. 123 at 4:25-5:1). Plaintiff's counsel even went so far as to say: "Whose conduct caused this event? Who has -- was the professional with the higher duty of care to follow those professional rules and prevent harm to follow – fellow drivers?" (Partial TT, Closing Argument, docket no. 123 at 6:12-6:15). "The natural sequence of events which is created when you swing wide to the left, as every professional driver's required to know, is you're going to trick the driver behind you." (Partial TT, Closing Argument, docket no. 123 at 7:15-7:17). "[T]here's a higher standard of professional negligence that professional drivers are required to follow. It's a higher standard. It's a higher standard because they're driving inherently dangerous vehicles." (Partial TT, Closing Argument, docket no. 123 at 20:16-20:19).

error.  The jury's failure to understand Clarke's duty to act only as an ordinary person under the circumstances can be inferred by the jury's ultimate award of excessive damages.  Furthermore, because Plaintiff did not submit any expert testimony to the jury regarding what the standard of care is for a professional driver in Clarke's locality or similar localities, there was absolutely no basis upon which the jury could find that Clarke somehow deviated from the standard of care of a "professional driver."

Generally, in professional negligence cases, the issue of whether a specific professional act or service demonstrates a lack of skill or knowledge or failure to exercise reasonable care is a matter that must be proved by expert testimony.  *See, e.g.*, *Vilcinskas v. Johnson*, 252 Neb. 292, 562 N.W.2d 57 (1997) (medical malpractice); *Overland Constructors v. Millard School Dist.*, 220 Neb. 220, 369 N.W.2d 69 (1985) (architectural malpractice).  Although the Nebraska Supreme Court has recognized a common knowledge exception to the expert testimony requirement in professional negligence cases, such an exception only applies "'where the evidence and the circumstances are such that the recognition of the alleged negligence may be presumed to be within the comprehension of laymen.'"  *Boyd v. Chakraborty*, 250 Neb. 575, 581, 550 N.W.2d 44, 48 (1996) (quoting *Halligan v. Cotton*, 193 Neb. 331, 227 N.W.2d 10 (1975)).

The testimony provided at trial reflects that an ordinary driver should not be expected to know of the so-called higher standard of care of a commercial driver.  (Exhibit 5, Neemann Depo. at 52:10-52:24) ("Q. Do you expect a normal driver who holds a regular driver's license to be familiar with the commercial driver's license manual? A. No. Q. Do you expect a normal driver to be aware of the special circumstances that are inherent in driving a commercial vehicle? . . . . A. No.").  Because the jury was given no information to guide them in determining a

standard of care for a professional driver, they were left to speculate regarding what a professional driver should have done in the situation presented to them.  As a result, the jury held Clarke to a duty far greater than that of an ordinary person under the circumstances, to the prejudice of Defendants.  For this reason, and all of the reasons set forth in this Brief, Defendants are entitled to a new trial.

### B.  Instruction on the Laws of Physics

This Court also erred when it charged the jury that: "I have decided to accept as proved the following fact: two objects cannot occupy the same space at the same time.  You must accept this fact as proved."  (Court's Charge to the Jury, docket no. 97, Instruction No. 8).  Defendants' counsel did not object to this instruction.  However, a court should grant a new trial, regardless of whether an objection was raised, where the instruction amounts to plain error that affected the substantial rights of the moving party.  *See* Fed. R. Civ. P. 51; *see also* Fed R. Civ. P. 59.  In this case, the above instruction amounts to plain error and it prejudiced Defendants to the point that it affected their substantial rights.

First, "'[t]he purpose of an instruction is to furnish guidance to the jury in their deliberations, and to aid them in arriving at a proper verdict; and, with this end in view, it should state clearly and concisely the issues of fact and the principles of law which are necessary to enable them to accomplish the purpose desired.'"  *First Nat'l Bank v. Bolzer*, 221 Neb. 415, 420, 377 N.W.2d 533, 536–37 (1985) (quoting *Bodtke v. Bratten*, 166 Neb. 36, 45, 88 N.W.2d 159, 166 (1958)).  It was the role of the jury in this trial to serve as the factfinder.  *See, e.g.*, *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992) (noting it is the role of the jury to serve as the principal trier of fact).  Plaintiff's counsel used the phrase, "two objects cannot occupy the same space at the same time," in an attempt to argue that the theories of Defendants' expert involving the

56

accident were impossible.  Where the Court found this fact as proven, and used the language of

Plaintiff's counsel in the Jury Instructions, it had the effect of telling the jury that the Court

adopted the Plaintiff's theory of the case and that Defendants' expert's conclusions were

factually impossible.  This was improper and affected Defendants' substantial right to a fair and

unbiased trial.

In addition, a trial court should not give a proffered instruction which unduly emphasizes

a part of the evidence in a case.  *See Kluender v. Mattea*, 214 Neb. 327, 331, 334 N.W.2d 416,

419 (1983) (citing *Bowley v. Airport Authority*, 186 Neb. 292, 182 N.W.2d 911 (1971)).  As a

matter of fact, the trial court must eliminate all matters not in dispute and submit to the jury only

the controverted questions of fact upon which the verdict must depend.  *Id.* at 331-32, 334

N.W.2d at 419 (citing *Ferlise v. Raznick*, 202 Neb. 745, 277 N.W.2d 94 (1979)).  At no time did

Defendants or their witnesses suggest that two objects could occupy the same space at the same

time.  Accordingly, where this fact was completely undisputed, the jury should not have been

charged on the issue.

A party is only entitled to a specific jury instruction if it is a correct statement of the law.

*United States v. Espinoza*, 684 F.3d 766, 783 (8th Cir. 2012).  Instruction Number 8 is not a

statement of the law at all.  It is also not an issue of fact in the case because it was never

disputed.  Accordingly, submitting the instruction to the jury was prejudicial error that affected

Defendants' substantial rights, in that Instruction Number 8 conveyed the message that the Court

had adopted Plaintiff's theory of the case and simultaneously rejected the opinion's offered by

Defendants' expert.  (*See* Partial TT, Closing Argument, docket no. 123 at 13:23-14:8).

Accordingly, for this reason and for all of the other reasons set forth in this Brief, Defendants are

entitled to a new trial.

57

### C.  Exclusion of Simulations

Defendants' expert witness, Benjamin Railsback ("Railsback"), a mechanical engineer and expert motor vehicle accident reconstructionist, prepared three simulations to assist him in conveying his rather complex opinions regarding the accident to the jury.  Plaintiff's counsel moved to exclude the simulations.  The Court then excluded the simulations over the objection of defense counsel.  However, the simulations constituted relevant and helpful demonstrative evidence that should have been admitted to aid the jury in understanding how the collision occurred.

Relevant evidence is admissible unless otherwise provided.  Fed.  R.  Evid. 402.  Thus, if the evidence is material and relevant, it must be received unless there is some reason for excluding it.  McCormick, Evidence § 179, pp. 385–86 (1954); IV Wigmore, Evidence, § 1151, p. 240 (3d ed. 1940).  The Nebraska Supreme Court has held that "'demonstrative exhibits are admissible if they supplement the witness' spoken description of the transpired event, clarify some issue in the case, and are more probative than prejudicial.'"  *State v. Pangborn*, 286 Neb. 363, 369-70, 836 N.W.2d 790, 797 (2013) (quoting *State v. Pangborn*, 286 Neb. 363, 369-70, 836 N.W.2d 790, 797 (2013)); *see also State v. Harrison*, 213 S.W.3d 58 (Mo. Ct. App. S.D. 2006) (noting that demonstrative evidence is relevant if it throws light on a material issue, or aids the jury in any way in arriving at the correct verdict); *Hughes v. State*, 943 So. 2d 176 (Fla. Dist. Ct. App. 3d Dist. 2006) (holding that demonstrative evidence is admissible when it is relevant to the issues in the case, and such evidence is generally more effective than a description given by a witness, for it enables the jury, or the court, to see and thereby better understand the question or issue involved); *Rich v. Cooper*, 380 P.2d 613 (Or. 1963) (holding that demonstrative evidence should not be arbitrarily excluded).

In this case, the demonstrative evidence offered by Defendants included three short simulations (Trial Exhibits 261, 262, 263), which depicted how Railsback believed the crash occurred based on his examination of the physical evidence.  (*See* Partial TT, Railsback, docket no. 105 at 119-120).  Railsback created the simulations using PC-Crash, a recognized and often-used accident reconstruction and simulation computer software program, based on a 3D model of the accident scene and physical evidence obtained from the accident scene.  (*See* Partial TT, Railsback, docket no. 105 at 30:1-30:25, 69:9-69:25).  The simulations included three different viewpoints of the accident, including (1) the viewpoint of what Plaintiff would have seen as he was operating his pickup behind the concrete mixer, (2) a viewpoint looking down on the accident from above, and (3) a viewpoint from an oblique angle of the scene, at about a 45 degree angle.  (*See* Partial TT, Railsback, docket no. 105 at 30:1-30:25, 69:9-69:25).  These simulations were essential in aiding Railsback's testimony which described his theory of the accident based on the skid marks and resting points of the vehicles.  Such depictions were necessary in order to show how Plaintiff negligently attempted to pass the concrete mixer truck on the right when it was in the process of a right turn.

Without these graphical aids, the jury had no means to visualize the relative positions of the vehicles in their respective lanes immediately prior to the accident.  Indeed, the only other visual illustrations of the accident at the jury's disposal were pictures of the scene taken after the accident and satellite images of the intersection obtained from "Google Earth."  Though these images were helpful, they did not assist the jury in understanding Railsback's projected positions of the vehicles, both on the road and in relation to each other, leading up to the collision.  Conversely, the simulations created by PC-Crash included models of each vehicle, drawn to scale, and provided a real-time simulation of each vehicle's projected path of motion.  Without

59

these visuals, the jury had no way to grasp the timing, position, and distance of each vehicle

leading up to the impact so that they could properly analyze the issue of negligence.  The visuals

would also have helped the jury understand why Railsback's opinions were not based on the

premise that two objects can occupy the same space at the same time, as Plaintiff's expert

opined.

The Plaintiff objected to the simulations for improper foundation and on the basis that the

evidence was cumulative.  (*See* Partial TT, Railsback, docket no. 105 at 71:1-71:18, 120:22-

121:17).  The Court sustained the objection to the offer, but did not state the basis for sustaining

the objection.  (*See* Partial TT, Railsback, docket no. 105 at 121:25-122:2).  As discussed in

*Bullock*,

> Animations are visual depictions that serve to illustrate or clarify such things
> as . . . an expert's opinion as to what occurred . . . .  Animations, therefore, are
> usually offered as illustrative evidence.  Because animations are typically used to
> illustrate witness testimony, if a computer-generated animation is offered into
> evidence, usually the only foundation necessary is that required of other forms of
> demonstrative evidence—the testimony of a knowledgeable witness that the
> animation fairly and accurately depicts what its proponent claims.

*Bullock v. Daimler Trucks N. Am., LLC*, 819 F. Supp. 2d 1172, 1176 (D. Colo. 2011) (citing 5

Federal Evidence § 9:26 (3d ed. 2010)); *see also Ortiz v. Yale Materials Handling Corp.*, 2005

WL 2044923 (D.N.J. Aug. 24, 2005) ("While the Federal Rules of Evidence do not have specific

provisions governing the admission of computer-generated simulations, reconstruction and

animation as substantive evidence, such computer-generated evidence has long been accepted as

an appropriate means to communicate complex issues to a lay audience, so long as the expert's

testimony indicates that the processes and calculations underlying the reconstruction or

simulation are reliable.").

Furthermore, "[i]f a computer program utilized by an expert is 'commonly used' and 'sufficiently reliable' then '[t]he [opposing party's] concerns about the factual basis of [the expert's] reports and opinions are best resolved by vigorous cross-examination and the presentation of contrary evidence.'" *Shadow Lake Management Co. Inc. v. Landmark American Ins. Co.*, 2008 WL 2510121 (E.D. La. June 17, 2008). Thus, the Eighth Circuit Court of Appeals has held that "a demonstrative video depiction is admissible if it is 'substantially similar' to the accident and any variation in the conditions are 'not . . . likely to confuse and mislead the jury.'" *Swift Transp. Co. of Arizona, LLC v. Angulo*, 716 F.3d 1127, 1138 (8th Cir. 2013) (quoting *Carter v. Mo. Pac. R.R.*, 284 Ark. 278, 681 S.W.2d 314, 315-16 (1984)).

In this instance, Defendants established the qualifications of Railsback as the expert who prepared the simulation. (*See* Partial TT, Railsback, docket no. 105 at 68:20-69:25). Moreover, Defendants established that the process used "was recognized in [Railback's] area of expertise as a method by which accident reconstruction experts illustrate their testimony," and that the simulations were "for the purpose of illustrating to the Court and the jury the testimony that" Railsback provided. (*See* Partial TT, Railsback, docket no. 105 at 70:5-70:8). Thus, because the simulations fairly and accurately depicted the accident based upon Railsback's thorough investigation of the accident scene and his use of PC-Crash, a recognized and often-used accident reconstruction and simulation computer software program, and because the demonstration would have been substantially similar to the accident and was not likely to confuse or mislead the jury, the simulations did not lack foundation and were admissible.

Furthermore, the simulations were not cumulative because they included models of the vehicles in their depiction of the accident. They also showed the vehicles moving in "real-time" in order to assist the jury in its understanding of the timing, and location of each of the vehicles

leading up to the accident.  Furthermore, even if the evidence was cumulative, the fact that demonstrative evidence is cumulative in nature does not necessarily require that it be excluded where it tends to shed light on a material fact in issue.  *See Burdett v. Hipp*, So. 2d 389 (Ala. 1949).  In this case, the simulations would have assisted Railsback in conveying his opinions regarding the facts surrounding the accident, and because the simulations would have helped the jury understand Defendants' evidence regarding how the accident occurred, it would have definitely shed light on a material fact at issue in the case.  Accordingly, the simulations were admissible, regardless of whether they may have arguably been cumulative.

In fact, if merely being cumulative were enough to keep out simulations as demonstrative evidence, simulations would almost always be inadmissible.  Such is the case because the simulations are generally used to help an expert explain their testimony to the jury.  The simulations are not shown in lieu of the expert's testimony.  It is well established that the purpose of demonstrative evidence is to "supplement the witness' spoken description of the transpired event [and] clarify some issue in the case."  *Pangborn*, 286 Neb. at 369-70, 836 N.W.2d at797.  Accordingly, where, as here, simulations were vital aids in assisting Railsback to explain his opinions to the jury, such simulations should have been admitted.

Although it is clear that a district court has wide discretion in its evidentiary rulings regarding demonstrative evidence, it is equally clear that the district court might be deemed to have abused that discretion where its ruling prohibits a party from having an opportunity to fully and fairly litigate its case.  In the instant action, Defendants' inability to present the simulations to the jury likely resulted in the jury's failure to comprehend the nature of the evidence regarding Plaintiff's own negligent conduct.  For this reason, and all of the other reasons stated in this Brief, the Court should grant Defendants a new trial.

## D. Plaintiff's "Calendar"

Defendants are also entitled to a new trial on the grounds that Plaintiff put inadmissible evidence in front of the jury in the form of a surprise demonstrative exhibit, specifically, a reproduced calendar for the month of October 2012. The "calendar" was allegedly prepared by Plaintiff's expert witness, Chris Mannel ("Mannel"). Defense counsel deposed Mannel on September 5, 2013, and asked Mannel if he had created anything else other than the items discussed during the deposition, or planned to use anything else in forming his opinions or testifying in this case. (Partial TT, Mannel, docket no. 116 at 31:3-31-9). Mannel responded in the negative. Apparently, Mannel created the "calendar" after the deposition, and Plaintiff's counsel elected to use the "calendar" as a surprise demonstrative exhibit, without giving any notice to defense counsel, showing it to defense counsel before revealing it to the jury in the courtroom, or listing the object on the exhibit list attached to the Final Pretrial Order. The Court allowed Plaintiff's counsel to use the "calendar" as a "demonstrative exhibit" with Mannel. However, the "calendar" was an improper demonstrative exhibit that contained inadmissible information.

A court should grant a motion for a new trial when evidence is erroneously admitted. *See Fireman's Fund Ins. Co.*, 466 F.2d at 186. "'Demonstrative exhibits are inadmissible when they do not illustrate or make clearer some issue in the case; that is, where they are irrelevant, or where the exhibit's character is such that its probative value is substantially outweighed by the danger of unfair prejudice.'" *Pangborn*, 286 Neb. at 370, 836 N.W.2d at 797 (quoting *Benzel v. Keller Indus.*, 253 Neb. 20, 28, 567 N.W.2d 552, 558 (1997)). The "calendar" that Plaintiff's counsel sought to use as a demonstrative exhibit with Mannel was inadmissible, irrelevant, and prejudicial, and it failed to illustrate or make clearer any issue in the case.

63

At the outset, the information in the "calendar" was not complex information that the jury needed to see on paper in order to understand.  It merely had some dates involving the concrete mixer truck, most of which were completely irrelevant to any fact at issue in the case.  By using the "calendar," Plaintiff's counsel sought to introduce ideas to the jury about how some "event" had occurred involving the concrete mixer truck on October 5, 2012.  (Partial TT, Mannel, docket no. 116 at 43:11-44:25).  However, this Court found that information was completely irrelevant to the facts at issue in the case.  (Partial TT, Mannel, docket no. 116 at 38:23-39:3, 46:6-46:12; Partial TT, Clarke, docket no. 120 at 75:7-77:2).  Thus, the fact that Plaintiff's counsel was able to use the "calendar" to suggest to the jury that some defect existed with the concrete mixer truck beginning on October 5, 2012, was completely improper and prejudicial to Defendants.

The "calendar" also included inadmissible information regarding the ECM data retrieval device, or "black box."  Plaintiff's counsel sought to use the "calendar" to put information regarding the ECM download before the jury.  Plaintiff tried to use the "calendar" with Mannel to suggest that the concrete mixer truck was involved in an event  that was recorded on the ECM.  Early in the trial, the Court ruled that Plaintiff's counsel was prohibited from inquiring about the ECM download.  However, Plaintiff's counsel repeatedly and improperly continued on several occasions to try to get that information into evidence, including questioning Mannel about the ECM download, trying to cross-examine Railsback about the subject, and attempting to use the "calendar" to get the information in front of the jury.  (Partial TT, Mannel, docket no. 116 at 39:8-42:21; 109:17-110:25).  As this Court repeatedly held, the information regarding the ECM download was completely irrelevant to any fact at issue in the case.  (Partial TT, Mannel, docket no. 116 at 39:8-42:21; 109:17-110:25).  Furthermore, Mannel did not have any foundation upon

64

which to testify about what the ECM download contained or to interpret what it meant.  (Partial TT, Mannel, docket no. 116 at 39:8-42:21; 109:17-110:25).  Accordingly, once again, the "calendar" contained improper and irrelevant information and there was absolutely no foundation for Mannel to even testify regarding the ECM download.  Accordingly, the "calendar," which contained inadmissible ECM download information, should not have been put before the jury.

In addition, in the square on the "calendar for October 18th, an entry was made which read "fixed?"  There was an issue in this case about whether or not a power steering oil leak on the concrete mixer truck discovered on or about October 16, 2012 was repaired on October 18th at NEBCO's repair facility in Lincoln, Nebraska.  The only reason for inclusion of the "fixed" statement  on the"calendar" was to suggest to the jury that the concrete mixer truck was never actually repaired, which in some way contributed to the accident..  Plaintiff's counsel's use of this "demonstrative exhibit" with Mannel was not in any way shape or form designed to illustrate or make clearer any issue in the case.  The "calendar" was also not "helpful" to "assist [Mannel] in conveying his opinions" to the jury, as Mannel claimed.  (Partial TT, Mannel, docket no. 116 at 30:14-30:17).  Mannel had absolutely no foundation upon which to testify about whether or not the concrete mixer truck was fixed.  (Partial TT, Mannel, docket no. 116 at 31:16-31:18; 32:21-33:13; 50:13-51:11).  The exhibit was not an appropriate "demonstrative exhibit" to use during Mannel's testimony as he admitted that he did not know whether the vehicle was fixed, (Partial TT, Mannel, docket no. 116 at 32:21-33:6) and the "calendar" could not have possibly helped Mannel explain his opinions as an accident reconstructionist in the case.

In sum, the "calendar" contained a significant amount of irrelevant and prejudicial information that was designed to confuse the jury and prejudice defendants—not to assist

65

Mannel with his testimony as Plaintiff's counsel suggested.  The "calendar" was inadmissible demonstrative evidence and it should have been excluded from the outset.  Defense counsel repeatedly objected to its use, thus preserving the issue.  In fact, it appears that the Court likely recognized its inadmissibility, even as a demonstrative exhibit, when the Court refused to allow Plaintiff's counsel to bring the "calendar" out when cross examining Clarke.  (Partial TT, Clarke, docket no. 120 at 73:7-78:4).  For all of these reasons, the Court should now find that the "calendar" was an inadmissible demonstrative exhibit that contained irrelevant and prejudicial information, and that the use of the "calendar," combined with each of the other legal errors discussed above, entitle Defendants to a new trial.

### III.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL, OR ALTERNATIVELY, A REMITTITUR, BECAUSE THE DAMAGES AWARDED ARE NOT SUPPORTED BY THE EVIDENCE

#### A.  The jury unreasonably failed to consider Plaintiff's comparative fault

No reasonable jury could have concluded, upon the evidence before it, that Plaintiff bore zero percent of the fault in causing the accident.  The State of Nebraska has adopted a comparative negligence approach to calculating damages.  Nebraska's comparative fault statutes provide:

> Any contributory negligence chargeable to the claimant shall diminish proportionately the amount awarded as damages for an injury attributable to the claimant's contributory negligence but shall not bar recovery, except that if the contributory negligence of the claimant is equal to or greater than the total negligence of all persons against whom recovery is sought, the claimant shall be totally barred from recovery.

Neb. Rev. Stat. § 25–21,185.09 (Reissue 2008).  The Nebraska Supreme Court "has recognized that 'a plaintiff is contributorily negligent if (1) she or he fails to protect herself or himself from injury, (2) her or his conduct concurs and cooperates with the defendant's actionable negligence, and (3) her or his conduct contributes to her or his injuries as a proximate cause.'"  *Connelly v.*

*City of Omaha*, 284 Neb. 131, 145, 816 N.W.2d 742, 756 (2012) (quoting *Baldwin v. City of Omaha*, 259 Neb. 1, 12, 607 N.W.2d 841, 850 (2000)).

"Because the purpose of comparative negligence is to allow triers of fact to compare relative negligence and to apportion damages on that basis, the determination of apportionment is solely a matter for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by credible evidence and bears a reasonable relationship to the respective elements of negligence proved at trial." *Fickle v. State*, 273 Neb. 990, 1003-04, 735 N.W.2d 754, 768 *opinion supplemented on overruling of reh'g*, 274 Neb. 267, 759 N.W.2d 113 (2007). However, as discussed above, the standard for granting a new trial is far different from the standard for reversal on appeal. When considering a motion for a new trial, this court should set aside the jury Verdict if it determines that the Verdict is against the clear weight of the evidence, that it is the result of passion or prejudice, or that the Verdict is excessive. *See Ouachita Nat. Bank v. Tosco Corp.*, 686 F.2d 1291, 1294 (8th Cir. 1982). Thus, a "trial court may conclude that there has been a miscarriage of justice" warranting a new trial, "[e]ven when *substantial* evidence supports [the] verdict." *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1267 (8th Cir. 1987) (alteration in original).

The Verdict in this case is against the clear weight of the evidence. During the trial, there was a substantial amount of evidence regarding Plaintiff's own negligence which the jury failed to consider and allocate in accordance with the instructions that this Court provided. A reasonable inference can be drawn that the jury was so influenced by Plaintiff's counsel's improper conduct throughout the trial that it refused to apportion any amount of fault to the Plaintiff during deliberations. For this reason, Defendants are entitled to a new trial.

During the trial, Roger Clarke testified that he was driving the concrete mixer truck north on Highway 75, and that after he went past what is known as the Ferrellgas corner, he turned on his right turn signal, started to decelerate to prepare to make his right hand turn, and he looked in his right side mirror.  He observed Plaintiff approaching at a high rate of speed in a pickup truck. (Partial TT, Clarke, docket no. 120 at 33:23-36:18, 44:1-44:7; Exhibit 2, Clarke Depo. at 136:16-136:21).  When Clarke started to make the right turn, Plaintiff attempted to pass Clarke on the right by driving on the shoulder of the road, and Plaintiff's Ford truck struck the right side of Clarke's concrete mixer truck.  (Partial TT, Clarke, docket no. 120 at 46:3-46:6; Exhibit 2, Clarke Depo. at 136:16-136:25).

Defendants' expert accident reconstructionist, Railsback, testified that the physical evidence demonstrated that, as Clarke was traveling northbound on Highway 75, Plaintiff was following Clarke's vehicle, and the distance between the two vehicles began to close.  (Partial TT, Railsback, docket no. 105 at 34:4-34:10).  As the concrete mixer reached the beginning of the left-hand turn lane, Plaintiff's pickup was closing in on the concrete truck, to the point that the distance between the two vehicles had closed to about 120 to 160 feet.  (Partial TT, Railsback, docket no. 105 at 34:8-34:17).

 The recommended driving practice in the Nebraska driver's manual is to follow at a distance of three seconds.  Plaintiff was traveling at 50 to 60 miles per hour as he approached the intersection.  At 50 miles per hour a vehicle is traveling 75  feet per second, which means Plaintiff should have been following at least 225 feet behind the concrete mixer truck, when in fact he was somewhere around one-half that distance.  In other words, Plaintiff was following too close and not maintaining his vehicle under reasonable and proper control. (Partial TT, Railsback, docket no. 105 at 38:3-39:1).

68

Railsback's calculations were confirmed by Thomas Wilmot, an independent eye-witness to the accident, and himself a semi driver. Wilmot testified that he was never able to see Plaintiff's pickup until it was passing the mixer truck on the right and the two vehicles had already collided. (Exhibit 8, Wilmot Depo. at 19:12-19:15; 28:17-31:22).

The concrete mixer was in the through lane, but at some point, near the entrance to the left turn lane, it did start to drift and cross over the line dividing the left-hand turn lane and the through lane of travel. (Partial TT, Railsback, docket no. 105 at 34:19-34:23). Railsback testified to a reasonable degree of scientific certainty that the concrete mixer continued traveling partially in the through lane, never vacated the through lane of travel, but traveled in an arc to the point where for a second or two it may have been half in the left turn lane and half in the through lane before moving back in to the through lane to make the right turn. (Partial TT, Railsback, docket no. 105 at 34:19-35:2; 36:4-37:20). Railsback concluded that, as Plaintiff's pickup continued north behind Clarke, it began to move toward the right and crossed the fog line so that Plaintiff was traveling on the right shoulder of the road. (Partial TT, Railsback, docket no. 105 at 35:3-35:9). Clarke continued northbound as he started to make a shallow right turn. The two vehicles came into contact near the fog line, such that the left side of Plaintiff's pickup collided with the right side of the concrete mixer. (Partial TT, Railsback, docket no. 105 at 35:10-35:17).

Plaintiff testified that Clarke turned on his left turn signal before fully veering into the left turn lane at the first possible opportunity and, believing the through lane to be clear, Plaintiff continued to drive in the through lane, until Clarke came back into the through lane and struck Plaintiff's truck. (Partial TT, Moyle, docket no. 118 at 13:1-13:11, 14:8-14:17, 20:3-20:6). Interestingly, Plaintiff's version of the events is the only version where Clarke had his left turn signal on, and Plaintiff's story was first told to his supervisor, after Plaintiff twice asked his

69

supervisor if he had found out what had happened.  (Exhibit 3, Barnes Depo. at 59:14-19; 69:4-24).

Plaintiff's expert witness, Mannel, testified that the damage on the two vehicles represented a side swipe type of collision, where one vehicle is passing another and the two come into contact with one another.  (Partial TT, Mannel, docket no. 116 at 74:10-74:16).  According to Mannel, the "area of contact" between the two trucks was at least 60 feet south of the intersection.  All of the other witnesses, including Plaintiff, had the collision occurring at the intersection.  Mannel testified that Plaintiff's vehicle was going faster than the concrete mixer, and that based on the marks on the road, Mannel believed the concrete mixer came from the left turn lane.  (Partial TT, Mannel, docket no. 116 at 76:6-76:10; 84:21-84:25).  Mannel could not determine when the concrete truck entered the left turn lane, how long it was in the turn lane, how fast it was going, or the path it took when it was in the left lane,(Partial TT, Mannel, docket no. 116 at 88:19:88:23, 89:21-90:6, 158:23-161:19).  In fact, Mannel previously testified in his deposition that the concrete mixer truck was only partly in the left turn lane, and that it traveled for a distance with the dividing lane line directly underneath the vehicle.  (Partial TT, Mannel, docket no. 116 at 162:9-164:4).  Mannel further testified that Plaintiff would have violated the Nebraska statutory rules of the road if Clarke had not completely vacated the left lane and Plaintiff passed Clarke on the right by driving onto the shoulder of the road.  (Partial TT, Mannel, docket no. 116 at 165:2-167:7).  Furthermore, if Clarke was only half way into the left turn lane and had his right turn signal activated, Plaintiff was required to exercise due caution, and, according to Mannel, the only safe thing for Plaintiff to do would have been to stay behind the concrete mixer truck and reduce his speed.  (Partial TT, Mannel, docket no. 116 at 170:11-174:3).  Mannel also testified during his deposition that, if Clarke's right turn signal was on, that

00580086.DOCX

fact would impact Mannel's opinions regarding whether it was safe for Plaintiff to attempt to pass on the right. (Partial TT, Mannel, docket no. 116 at 176:21-177:11).

Even if the testimony of the parties and their expert witnesses is disregarded for purposes of this analysis, the testimony of each and every independent witness in this case demonstrates that Plaintiff was contributorily negligent. With the exception of Plaintiff, every witness who either observed the accident, or arrived shortly after the accident, testified that Clarke's right turn signal was activated before the collision. For example, Ronnie Dean Schalk, Jr. testified that he works for Concrete Industries, Inc., and when he learned about the accident, he drove to the scene, turned on the concrete mixer, and observed that the right turn signal was on.

Similarly, the sole eye witness to the collision was Tom Wilmot ("Wilmot"). Wilmot is an over the road truck driver and he was traveling south on Highway 75, and approaching the intersection with Highway 34 at the time of the collision. (Exhibit 8, Wilmot Depo. at 9:10, 17:17-17:23). Wilmot testified that as he was approaching the intersection, he had a clear view of the concrete mixer truck. (Exhibit 8, Wilmot Depo. at 18:4-18:21). Wilmot testified that the concrete mixer was slowing down, had its right turn signal activated the entire time, and that it was moving toward the right side of the road, as though it was about to turn right. (Exhibit 8, Wilmot Depo. at 19:16-21:23). Wilmot testified that the concrete mixer never had its left turn signal activated, and never entered the left turn lane. (Exhibit 8, Wilmot Depo. at 21:22-23; 24:5-24:10). Wilmot emphasized that if he had seen the truck in the left turn he would have taken notice and "would have watched to see if [the cement truck] would have turned in front of [him]," across highway 75 and onto highway 34. Wilmot testified that he never saw Plaintiff's pickup truck until after the collision. (Exhibit 8, Wilmot Depo. at 19:12-19:15, 28:17-30:5). Rather, as the concrete mixer began making its right turn, he observed the pickup truck roll over

the top of the concrete truck and land on its roof.  (Exhibit 8, Wilmot Depo. at 19:12-19:15, 28:17-31:22).  However, perhaps the most important thing to which Wilmot testified was the fact that, based upon all the things which he observed about the concrete mixer truck prior to collision (all of which items Plaintiff could have observed if he was paying adequate attention), Wilmot's assumption was that the concrete mixer truck "was turning right onto a gravel road." (Exhibit 8, Wilmot Depo. at 26:1-26:24).

Cass County Sherriff Deputy Jeffrey J. Arens ("Deputy Arens") was the first officer at the scene of the accident.  Arens testified that the concrete truck had its right turn signal on when he arrived within minutes of the collision.  (Partial TT, Arens, docket no. 117 at 11:10-11:14). Arens also observed marks on the right hand shoulder of the road that he determined to be from Plaintiff's truck.  (Partial TT, Arens, docket no. 117 at 29:17-29:24).  Arens concluded that Plaintiff violated Nebraska state law when he drove on the right shoulder of the road, and when he attempted to pass Clarke within one hundred feet of an intersection.  (Partial TT, Arens, docket no. 117 at 29:25-32:25).

All of this testimony makes clear that Plaintiff's own negligence contributed to the cause of the accident and his own injuries.  The law is well established that "[d]rivers are required to maintain a proper lookout for their own safety and the safety of others."  *See Tadros v. City of Omaha*, 269 Neb. 528, 536, 694 N.W.2d 180, 188 (2005) (*citing Springer v. Bohling*, 263 Neb. 802, 643 N.W.2d 386 (2002)); *see also Kimberling v. Omaha Public Power Dist.*, 225 Neb. 744, 746, 408 N.W.2d 269, 271 (1987) (holding plaintiff was contributorily negligent because "[d]rivers of motor vehicles are obligated to maintain a proper lookout and have the duty to see what is in plain sight").  It is also a violation of Nebraska state law to drive a vehicle on a highway at a speed that is greater than is reasonable and prudent under the circumstances and

72

with regard to the actual and potential hazards then existing.  *See* Neb. Rev. Stat. § 60-6,185.  In fact, Neb. Rev. Stat. § 60-6,185 states, in its entirety:

> No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. A person shall drive at a safe and appropriate speed when approaching and crossing an intersection or railroad grade crossing, when approaching and going around a curve, when approaching a hillcrest, when traveling upon any narrow or winding roadway, and when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions.

Neb. Rev. Stat. § 60-6,185.  Similarly, any person who drives a motor vehicle without due caution so as to endanger any person or property is guilty of careless driving.  *See* Neb. Rev. Stat. § 60-6,212.  It is also a violation of Nebraska law to pass another vehicle within 100 feet of an intersection, to drive on the shoulder of a highway, or to attempt to pass a vehicle on the right unless the movement can be made safely.  *See* Neb. Rev. Stat. 60-6,136, Neb. Rev. Stat. § 60-60,142; Neb. Rev. Stat. § 60-6,134.  Nebraska statutes also provide that drivers shall not follow other vehicles more closely than is reasonable and prudent, and that they shall have due regard for the speed of the vehicles they are following.  *See* Neb. Rev. Stat. § 60-6,140.

The violation of a safety regulation or state statute is evidence of negligence which must be considered by a jury when considering the comparative negligence of two parties.  *Cf. Raben v. Dittenber*, 230 Neb. 822, 825, 434 N.W.2d 11, 13 (1989).  "The apportionment of damages is determined by considering the relative fault of the parties."  *Tadros v. City of Omaha*, 269 Neb. 528, 535, 694 N.W.2d 180, 187 (2005).  The Nebraska Supreme Court has stated:

> [An] important factor to be considered in apportioning fault is "the extent to which [each person's risk-creating] conduct failed to meet the applicable legal standard."  Restatement (Third) of Torts: Apportionment of Liability § 8, comment c. at 87 (2000).  That party X deviated substantially from its standard of care while party Y's deviation was only slight suggests that X should shoulder a higher burden for the damage done.

*Tadros v. City of Omaha*, 269 Neb. 528, 535, 694 N.W.2d 180, 187 (2005) (quoting *Aguallo v. City of Scottsbluff*, 267 Neb. 801, 808, 678 N.W.2d 82, 90 (2004)).

Based solely on the testimony of the independent third-parties in this case, Plaintiff's negligence was greater than that of Defendants.  Specifically, the testimony of the independent witnesses in this case demonstrated that Plaintiff was following Clarke so closely, and at such a high rate of speed, that his vehicle was not visible to oncoming traffic.  The testimony of the independent witnesses in this case is that Clarke acted at all times as though he was preparing to turn right, as demonstrated by the facts that he reduced his rate of speed, he turned on his right turn signal, and he began turning to the right side of the road.  Despite this, the evidence suggests that Plaintiff attempted to overtake Clarke's vehicle by passing him on the right shoulder, just before reaching the intersection.

In such a situation, where Plaintiff's negligence was equal to or greater than the total negligence of Defendants, Plaintiff should be barred from recovery.  *See* Neb. Rev. Stat. § 25–21,185.09.  However, even if Plaintiff's negligence was less than that of Defendants, based upon all of the evidence at trial, no reasonable jury could have found that Plaintiff's own negligence was not a contributing proximate cause of the accident.  The jury's failure to consider the evidence regarding Plaintiff's contributory negligence was likely the result of passion and prejudice created by Plaintiff's counsel or the jury's failure to consider all of the evidence and to follow the Court's instructions during their deliberations, which only lasted about two hours.  Accordingly, Defendants are entitled to a new trial based upon the jury's failure or refusal to consider Plaintiff's contributory negligence.

00580086.DOCX

**B. The damages awarded are not supported by the evidence and are the result of passion and prejudice by the jury, accordingly, Defendants are entitled to a new trial, or alternatively, a remittitur**

**1. The evidence at trial does not support the Verdict**

Even if this Court finds that Plaintiff proved Defendants' negligence by a preponderance of the evidence, the jury's award of damages in the amount of $19,607,486.00 is not supported by the evidence. Plaintiff's primary witness on damages was Dr. Gary Yarkony ("Yarkony"). Yarkony testified that Plaintiff's medical bills from the time of the accident on October 31, 2012, through July 31, 2013, amounted to **$366,074.46**. (Partial TT, Yarkony, docket no. 119 at 16:22-16:24). In addition to his apparent medical expenses, the past medical bills also included a $20,500.00 expenditure for a new vehicle, and a $1,403.49 expenditure for a vehicle modification. (Trial Exhibit 63).

After testifying about Plaintiff's past medical expenses, Yarkony then went on to offer opinions regarding Plaintiff's future medical expenses. Yarkony opined that, although Plaintiff's medications would vary, he would spend $342.25, per month, on the medications he was currently listed as taking. (Partial TT, Yarkony, docket no. 119 at 32:18-23; Trial Exhibit 63 at 2). This included a $189.99 monthly expense for a narcotic pain medication, despite Plaintiff's testimony that he was not taking narcotics, and had not been taking any prescription pain medications for several months. (Partial TT, Moyle, docket no. 118 at 41:6-41:15). Yarkony also allocated $1,020 in monthly expenditures for disposable supplies, and between $1,500 to $2,000 in annual expenditures for follow up medical treatment. (Partial TT, Yarkony, docket no. 119 at 23:22-25; Trial Exhibit 63 at 2). Yarkony also testified, without providing any basis for his opinion, that Plaintiff will be in a rehabilitation hospital in the future, with a minimum lifetime expense ranging from $48,000.00 to $96,000. (Partial TT, Yarkony, docket no. 119 at

23:22-25, 34:15-20; Trial Exhibit 63 at 3).  Yarkony opined that Plaintiff would incur annual

expenses for durable medical equipment in the amount of $5,850.33, including a $4,500

wheelchair that Plaintiff would have to replace every three years.  (Partial TT, Yarkony, docket

no. 119 at 24:1, 34:22-36:19; Trial Exhibit 63 at 3).  Yarkony also opined that, beginning at age

40, Plaintiff would expend $4,690.00 annually on additional durable medical equipment.  (Partial

TT, Yarkony, docket no. 119 at 23:22-25; Trial Exhibit 63 at 3).  This expense includes a power

wheelchair and cushion, which Yarkony opines must be replaced every three years.  (Partial TT,

Yarkony, docket no. 119 at 23:22-25, 37:7-25; Trial Exhibit 63 at 3).  Thus, beginning at age 40,

Plaintiff will purportedly need two brand new wheelchairs every three years, and a new standing

wheelchair every five years.  (Trial Exhibit 63 at 3).

Next, Yarkony stated that Plaintiff would continue his current therapy program for two

years, at an expense of $20,800.00, and would receive future therapy, including physical therapy,

counseling, and occupational therapy, at a cost of somewhere between $38,700 and $43,900.

(Partial TT, Yarkony, docket no. 119 at 24:2-3, 38:2-25; Trial Exhibit 63 at 4).  Yarkony also

opined that Plaintiff would need at-home care beginning at age 40.  (Partial TT, Yarkony, docket

no. 119 at 24:4-10; Trial Exhibit 63 at 4).  Specifically, beginning at age 40, Yarkony alleged

that Plaintiff would need care for 8 hours a day, 365 days a year, for ten years.  (Partial TT,

Yarkony, docket no. 119 at 24:4-10; Trial Exhibit 63 at 4).  Then, beginning at age 50, Yarkony

believes that Plaintiff will need care for 12 hours a day, 365 days a year, for ten years.  (Partial

TT, Yarkony, docket no. 119 at 24:4-10, 43:4-6; Trial Exhibit 63 at 5).  For the next ten years,

from age 60 to 70, Yarkony believes that Plaintiff will need care for 16 hours a day, every single

day.  (Partial TT, Yarkony, docket no. 119 at 24:4-10, 43:7-11; Trial Exhibit 63 at 5).  After age

70, Yarkony believes that Plaintiff will need 24-hour care, 365 days a year.  (Partial TT,

76

Yarkony, docket no. 119 at 24:4-10, 43:12-17; Trial Exhibit 63 at 5). In his analysis, Yarkony set forth two potential rates for at home care, for each period of years discussed above. (Trail Exhibit 63 at 3-4). Plaintiff's expert witness, Jerome Sherman ("Sherman"), adopted the middle of the two rates for his analysis. (Trial Exhibit 74, at 3). Using the middle rate that Plaintiff proposes, the total annual cost for Plaintiff's at home care would be $63,145 from ages 40-50; $94,717 from ages 50-60; $126,290 from ages 60-70; and $189,435 from ages 70-77. (Trial Exhibit 74, at 3). Yarkony also opines that Plaintiff will need between $224,250.00 and $322,000.00 for a wheelchair accessible ranch home. (Partial TT, Yarkony, docket no. 119 at 45:18-46:4; Trial Exhibit 63 at 5)

One of the last items on Yarkony's Medical Care Plan is one of the most questionable. Yarkony asserts that Plaintiff will need a brand new wheelchair accessible Dodge Grand Caravan or Honda Odyssey every five years, at a cost between $49,995.00 and $55,000, for life. (Partial TT, Yarkony, docket no. 119 at 24:11-13; Trial Exhibit 63 at 5). Yarkony did not account for the trade in value of any prior vehicles in his analysis. (Partial TT, Yarkony, docket no. 119 at 72:25-73:4). However, a reduction should have been provided for the significant trade-in value of a five year old wheelchair accessible van. Yarkony also did not account for the fact that, beginning at age 40, Plaintiff is supposed to be the recipient of at-home care every single day for eight hours a day, or that beginning at age 50, Plaintiff is supposed to be receiving at home care for twelve hours a day, or that Plaintiff will eventually be receiving around the clock care. The suggestion that Plaintiff will need a brand new van every five years, despite receiving in home care every single day, for much of the day, is contrary to common sense.

The accuracy of some of Yarkony's opinions is also questionable in light of the other evidence in the case. For example, Yarkony opined that Plaintiff would likely be unemployed

for the remainder of his life because Plaintiff was on narcotic pain medications, and most spinal cord injury patients do not work after their injuries.  (Partial TT, Yarkony, docket no. 119 at 27:13-27:21; Trial Exhibit 76 at 1).  However, Plaintiff testified that he was not taking narcotics, and had not been taking any prescription pain medications for several months.  (Partial TT, Moyle, docket no. 118 at 41:6-41:15).  Plaintiff also testified he would be willing to go to school, and that he would like to go back to work, and that he intended to fully maximize his rehabilitation to accomplish that.  (Partial TT, Moyle, docket no. 118 at 41:16-42:24).  In fact, Yarkony's opinion that Plaintiff will not return to work seems inconsistent with his allocation of $11,400.00 for Plaintiff to attend 50 sessions of occupational therapy.  (Trial Exhibit 76 at 4).

Nonetheless, despite the questionable nature of some of Yarkony's assumptions and opinions, Plaintiff's expert witness, Sherman, calculated the lifetime cost of each of the items Yarkony itemized in his Medical Care Plan.  Specifically, Sherman calculated the lifetime cost of Plaintiff's medications, additional medical care, rehabilitation hospitalization, and therapy, when reduced to present value, to be $421,749.  (Trial Exhibit 74 at 3).  Sherman then calculated the lifetime cost of Plaintiff's disposable supplies and durable medical equipment, when reduced to present value, to be $860,381.  (Trial Exhibit 74 at 3).  Next, Sherman calculated Plaintiff's projected life time cost for at-home care, when reduced to present value, to be $2,479,940.  (Trial Exhibit 74 at 3).  Thus, Sherman concluded that the present value of all of the items in the Medical Care Plan is **$3,762,070**.

Next, Sherman accounted for Plaintiff's potential loss of earning capacity.  Sherman noted that Plaintiff was currently making $10.00 per hour, and assumed that Plaintiff's earning potential was $20,800 per year.  (Trial Exhibit 74 at 7).  Sherman made this assumption, despite the fact that Plaintiff had never previously earned anywhere close to that amount.  (Trial Exhibits

00580086.DOCX

250-254).  Nonetheless, Sherman calculated that Plaintiff had past lost wages in the amount of

$20,800, and future lost wages, that, when reduced to present value, amounted to $531,476.00,

for a total of **$552,276** for past and future lost wages.  (Trial Exhibit 74 at 7).  Thus, the grand

total of Plaintiff's past medical expenses and lost wages, and future medical expenses and future

lost earning capacity, both reduced to present value, is _**$4,680,420.46**_.

The other damages that Plaintiff might be entitled to would be those generally labeled as

general damages.  During Closing Arguments, the closest Plaintiff's counsel came to stating a

specific number for general damages was when he made the argument that Plaintiff was entitled

to $1 million, or $20,000 per year for fifty years, for the loss of his bladder or bowel function; $3

million, or $60,000 per year for fifty years, for the loss of activities such as normal intimacy and

sexual function; and $5 million, or $100,000 per year for fifty years, for full paralysis of his

lower body, for a total of $9,000,000 over fifty years.  (Partial TT, Closing Argument at 27:3-

29:5).  It is well established in the law that damages for items such as pain and suffering must be

reduced to present value.  *See Oberhelman v. Blount*, 196 Neb. 42, 49, 241 N.W.2d 355, 360

(1976).  The present value of $9 million, assuming a prudent investment rate of 6.32 percent, is

_**$2,715,114.93**_.  (Exhibit 7, Friesen Affidavit at ¶ 9).

Thus, based solely on the arguments and evidence presented at trial, the absolute

maximum amount of Plaintiff's damages which could potentially be supported by the evidence

would be _**$7,395,535.39**_.[5]  Because the actual amount of damages awarded was nearly three

times the amount possibly supported by any evidence in the case, a reasonable inference can be

---

[5] This number represents the grand total of Plaintiff's purported past medical expenses, future
living and medical expenses reduced to present value, past lost wages, and future lost wages
when reduced to present value, plus Plaintiff's purported damages for pain and suffering,
reduced to present value.  However, Defendants are not conceding that this is an accurate
calculation of Plaintiff's damages.  Instead, it is the greatest possible number than any jury could
have found on this record.

drawn that: (1) either the jury was influenced by passion and undue prejudice when it rendered its Verdict, or (2) the jury failed to understand this Court's instructions regarding the necessity of reducing the amount of damages to present value when calculating the award.

Furthermore, as discussed above, Plaintiff's own negligence contributed to the accident and should be considered. Plaintiff's own negligence was the primary factor in causing the accident. According to the only independent witnesses that observed the collision, or arrived shortly after, Clarke had his right turn signal on and he was reducing his speed as he approached the intersection. Plaintiff was following Clarke so closely that he could not be seen by oncoming traffic. As they neared the intersection and Clarke prepared to take his right turn, Plaintiff attempted to pass Clarke on the right by driving on the shoulder, and the two cars collided in a side-swipe type collision. However, even assuming Plaintiff sustained damages in the full amount set forth above and Plaintiff's own contributory negligence amounted to only forty percent of the cause of his injuries, Plaintiff's award should have been reduced to *$4,437,321.23*. In sum, Plaintiff's damages award is plainly excessive, and for this reason, Defendants are entitled to a new trial, or at the very least, a remittitur.

### 2. Applicable law

This Court must set aside the Verdict if it determines that it is against the clear weight of the evidence. *Ouachita Nat. Bank*, 686 F.2d 1294 (citing *Fireman's Fund Ins.*, 466 F.2d at 186)). Likewise, "[t]he trial court has an opportunity to set aside a verdict or to order a remittitur if, in the opinion of the court, the jury has exceeded the limits of fair and reasonable compensation." *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1149-51 (8th Cir. 1984). This Court is entitled to considerable discretion in its decision to grant a new trial or remittitur. *See*

*Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1111 (8th Cir. 2014); *Ouachita Nat. Bank*, 686 F.2d at 1295.

In diversity actions, the district court must look to the forum state's case law for guidance on the question of whether the award was excessive, *Stineman v. Fontbonne College*, 664 F.2d 1082, 1089 (8th Cir. 1981) and the damage award may not exceed "that which could be sustained were the case before the highest court of the state whose substantive law gives rise to the claim." *Hysell v. Iowa Public Service Co.*, 559 F.2d 468, 472 (8th Cir. 1977). Thus, "[f]ederal law governs whether remittitur is appropriate," but courts "'refer to the law of the forum state when determining the inadequacy or excessiveness of a jury verdict.'" *Tedder*, 739 F.3d at 1111 (quoting *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1150 (8th Cir. 1984)); *see also In re Levaquin Prods. Liability Litig.*, 700 F.3d 1161, 1165 (8th Cir. 2012) (quoting *Carpenter v. Auto. Club Interinsurance Exch.*, 58 F.3d 1296, 1301(8th Cir. 1995)) ("When federal jurisdiction is premised on diversity of citizenship, a federal district court applies the sufficiency standards of the state in which it sits . . . ."). Accordingly, in this case, Nebraska law will govern whether the damages awarded were excessive.

Under Nebraska Law, a new trial shall be granted if the amount of recovery is excessive such that it is not supported by sufficient evidence or appears to have been given under the influence of passion or prejudice. *See* Neb. Rev. Stat. § 25-1142(4); *see also Ouachita Nat. Bank.*, 686 F.2d at 1294 (holding that a district court, in considering a motion for new trial, must set aside a jury verdict where it has determined that the verdict is against the clear weight of the evidence, that it is the result of passion or prejudice, or that the verdict is clearly excessive); *Burge v. C.F. Adams Co.*, 98 Neb. 4 (1915) (finding that the verdict, under the evidence was so grossly excessive that it must have been the result of passion and prejudice and remanding the

case for further proceedings).  Similarly, a remittitur may be appropriate where a party's counsel inflames a jury's passion and prejudice, even if done so unintentionally.  *Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1112 (8th Cir. 2014).  If a verdict shocks the conscience, it necessarily follows that the verdict was the result of passion, prejudice, mistake, or some other means not apparent in the record.  *Williams v. Monarch Transp., Inc.*, 238 Neb. 354, 358, 470 N.W.2d 751, 754-55 (1991).

### 3.  Analysis

The excessive nature of the jury's Verdict in this case becomes readily apparent when viewed in light of its future value.  As this Court is aware, the gross Verdict amount is $19,607,486.  The net Verdict amount is $14,927,065.54, after subtracting the past medical expenses, the present value of the total economic loss, and the present value of the Medical Care Plan.  (Exhibit 7, Friesen Affidavit at ¶ 5(g)).  If the value of the gross and net verdict amounts were prudently invested at a rate of 6.32 percent (a rate which Dr. Jerome Sherman, plaintiff's expert economist testified was an average paid on a prudent investment in intermediate government bonds for the past fifty years), and no withdrawals were made for Plaintiff's life, the gross Verdict amount would grow to a future value of $437,524,461.39, and the net Verdict amount would grow to a future value of $333,084,838.64.  (Exhibit 7, Friesen Affidavit at ¶ 6).  In contrast, if Plaintiff elected to prudently invest the Verdict amount at the same rate, and live off a proportional share of the Verdict amount each month, the gross Verdict amount would provide him a monthly lifetime income of $107,682.  In comparison, the net Verdict amount would provide Plaintiff a monthly lifetime income of $81,978.  (Exhibit 7, Friesen Affidavit at ¶ 7).

82

Plaintiff could also elect to place the damages award in a lifetime annuity with Fidelity Investments, which guarantees a return of principal upon the death of the annuitant. (Exhibit 7, Friesen Affidavit at ¶ 8). If Plaintiff placed the full amount of the gross Verdict in such an annuity, it would provide him with a monthly lifetime income of $48,293, with a full refund of $19,607.486 upon his death. (Exhibit 7, Friesen Affidavit at ¶8). In comparison, if Plaintiff placed the full amount of the net Verdict in such an annuity, it would provide him with a monthly lifetime income of $36,765, with a refund of $14,927,065.54 upon his death. (Exhibit 7, Friesen Affidavit at ¶ 8).

In light of the obscenely high future value of the award, it is very clear that the jury either wholly failed to account for present value, or was inflamed by passion or prejudice when rendering its award. However, regardless of the reasons for the award, it is excessive, it is not supported by the evidence in the case, and it far exceeds the limits of fair and reasonable compensation. "It is a well-established principle of law that where a verdict in a personal injury case is excessive and that it appears to have been returned under the influence of passion and prejudice rather than upon the facts or that the jury misapplied the law, it is the duty of this court to set the verdict aside and grant a new trial." *Peacock v. J.L. Brandeis & Sons*, 157 Neb. 514, 519, 60 N.W.2d 643, 647 (1953). "The determination of whether or not it may be said that the verdict was the result of passion and prejudice must depend . . . upon whether or not it is so disproportionate to the injury and damage as disclosed by the evidence as to indicate that the jury disregarded the evidence and based its verdict on other considerations." *Id.* at 521, 60 N.W.2d at 648. The facts in this case demonstrate the ultimate Verdict rendered in this case is nearly three times that of the highest possible award that could have been even remotely supported by the evidence and arguments in the record. If Plaintiff's own negligence is taken into consideration,

83

the award is nearly four times more than the evidence would support.  This award is so vastly disproportionate to Plaintiff's injury and damages, that it must be presumed that the jury rendered the Verdict under the influence of passion or prejudice, or simply misapplied the instructions this Court provided.  *See Rice v. Union Pac. R. Co.*, 82 F. Supp. 1002, 1008 (D. Neb. 1949) (finding verdict excessive and granting remittitur); *Heiden v. Loup River Public Power Dist.*, 139 Neb. 754 (1941) (finding verdict excessive and granting new trial); *Stewart v. Weiner*, 108 Neb. 49, 187 N.W. 121 (1922) (granting a new trial after finding excessive verdict was the result of passion and prejudice).  For these reasons, Defendants are entitled to a new trial, or, at the very least, a remittitur.

Not only was the Verdict in this case excessive, in that it was not supported by the evidence, but it is also excessive in comparison with other cases in Nebraska.  For example, in *Carlson v. Okerstrom*, 267 Neb. 397, 421-22 (2004), the Nebraska Supreme Court upheld a jury award for a husband and wife in the amounts of $894,901, and $259,587, respectively, where they both sustained significant injuries after an automobile accident.  Specifically, the evidence demonstrated that the husband incurred medical expenses and would continue to incur medical expenses over time, he sustained optic nerve damage and suffered loss of peripheral vision in his right eye, he suffered loss of bladder control so that he would have to self-catheterize himself for life, and he also experienced impotency, headaches, chronic pain, psychological trauma, and physiological contusions and trauma.  The wife suffered injuries including, among other things, cracked ribs, fatigue, and acute cervical strain causing intolerable pain in her lower back and hip.  Both the husband and the wife also made loss of consortium claims because they were no longer able to maintain a sexual relationship.  With inflation, the awards would today be valued at $1,108,161.26, and $321,448.13, respectively.  *See* CPI Inflation Calculator,

http://www.bls.gov/data/inflation_calculator.htm.  The award in *Carlson* demonstrates how entirely unreasonable the award is in the instant action.  Although it is undeniable that Plaintiff's damages are significant, the plaintiff in *Carlson* also suffered from many of the same types of damages as the Plaintiff in this action.  While it is true that the plaintiff in *Carlson* was not rendered a paraplegic, a significant portion of Plaintiff's alleged general damages in this case are based upon his lack of control over his bladder function and his sexual dysfunction.

Another appropriate case to consider is *Shipler v. Gen. Motors Corp.*, 271 Neb. 194, 233, 710 N.W.2d 807, 840 (2006), in which the Nebraska Supreme Court upheld a $19,562,000 verdict.  *Shipler* was a products liability case where there was no issue of comparative negligence.  The *Shipler* case is so important because the distinguishable facts in that case demonstrate that the Verdict in this case is so excessive as to shock the conscious.  The plaintiff in *Shipler* was in a rollover motor vehicle accident and the roof of the vehicle was crushed, causing her extensive injuries.  The plaintiff was rendered a quadriplegic, so she did not have use of her entire lower body, including her arms.  She could not manage any of her day to day activities, which Plaintiff can do.  The plaintiff in *Shipler* will never be able to brush her hair, or her teeth, give herself a bath, or catheterize herself, because someone else will have to do it for her.  The plaintiff in *Shipler* will never be able to wheel herself around in a wheelchair or drive a new van every five years because she does not have the use of her arms.  Similarly, the plaintiff in *Shipler* will never be able to work, even in a sedentary job, and would not have any income for her projected life expectancy of 45 years, whereas there is absolutely no reasonable evidence in the record that Plaintiff cannot work.  Furthermore, the *Shipler* plaintiff had past and future medical expenses of approximately $10 million dollars, approximately half the amount of her overall award.

In *Wagner v. Union Pac. R. Co.*, 11 Neb. App. 1, 4, 642 N.W.2d 821, 829 (2002), a jury awarded the plaintiff $1.9 million.  In *Wagner*, the plaintiff was working for a railroad, when he sustained significant injuries after falling from the walkway on a locomotive that the railroad negligently failed to keep free from ice and snow. *Id.*, 642 N.W.2d 821, 829.  Wagner sustained past and future medical expenses, past and future lost wages, decreased earning capacity, past and future pain and suffering, and a permanent, disabling back injury that caused abnormal motion and devastating pain. *Id.* at 24, 642 N.W.2d at 842.  After the accident, the plaintiff's wife left him, and he could no longer work or engage in his past activities.  *Id.* at 26, 642 N.W.2d at 843.  The Nebraska Court of Appeals noted that the plaintiff established loss of income and future earnings of approximately $1,120,000, and more than $30,000 in future medical expenses, so that the jury's award for pain and suffering was likely just over $700,000, and that such an award was not so excessive as to shock the conscience.  *Id.* at 26-27, 642 N.W.2d 821, 843-44 (2002).

In *Lager v. Schumacher*, 1 Neb. App. 1159, 1160, 510 N.W.2d 558, 560 (1993), the Nebraska Court of Appeals upheld a verdict in the amount of $145,000 for a wife, and a verdict in the amount of $71,000 for her husband.  *Id.*, 510 N.W.2d 558, 560.  The husband and wife sued for damages sustained after being involved in a motor vehicle accident.  *Id.*, 510 N.W.2d 558, 560.  The trial court held that the defendant was negligent as a matter of law, and submitted the issue of damages to the jury.  *Id.*, 510 N.W.2d 558, 560.  The evidence demonstrated that the wife suffered head, face, neck, chest, and leg injuries, and left her with facial nerve damage that caused the tissues surrounding her left eye to sag and obstruct her field of vision.  *Id.*  The husband sustained head injuries and a severe impact to his chest, which exacerbated an existing

cardiovascular condition, resulting in lifelong health problems. *Id.* The accident also had a devastating impact on their relationships with each other and with their family. *Id.*

In *Bakhit v. Thomsen*, 193 Neb. 133, 137, 225 N.W.2d 860, 863 (1975), the Nebraska Supreme Court held that a verdict in the amount of $72,000 was not excessive for a forty-four year old plaintiff who was injured in a motor vehicle accident. In that case, the facts demonstrated that the plaintiff, who had been helping to support her family, would be unable to work, and had also incurred medical expenses, so that when reduced to present value, her lost wages and medical expenses amounted to $82,292.50, and the plaintiff experienced considerable pain and suffering, as she was permanently disabled and could not remain seated or stand for long periods or walk long distances. The present value of the verdict in that case today would be $313,047.43. *See* CPI Inflation Calculator, http://www.bls.gov/data/inflation_calculator.htm.

In *Hysell v. Iowa Pub. Serv. Co.*, 559 F.2d 468, 471 (8th Cir. 1977), the Eighth Circuit Court of Appeals upheld a verdict rendered for a plaintiff construction worker after he sustained injuries when he came in contact with a boom truck which was touching a high voltage power line. The plaintiff was awarded $1.5 million. *Id.* The plaintiff suffered extensive burns over much of his body, resulting in weakening of his abdominal wall, kidney damage, significant restriction in motion in his left shoulder, his left arm and both legs had to be amputated, he suffered phantom pain in his missing limbs, he had to undergo numerous surgeries, he experienced further pain when he used his prostheses, he was rendered completely disabled, he had a 31.2 year work life expectancy after the trial, and he needed constant attendance and assistance to perform even simple daily tasks. *Id.* Of the award, a majority was for medical expenses, attendant care, and loss of earnings. *Id.* at 471-72. Only $300,000 of the award was for pain and suffering. *Id.*

87

In *Steinauer v. Sarpy County*, 217 Neb. 830 (1984), an automobile driver brought a personal injury action against the county after the husband's vehicle collided with a dump truck. The driver received an award in the amount of $3.9 million, and the court held the award was not excessive. *Id.* at 848. The court noted that the plaintiff in that case had his life expectancy cut from 20.47 years to 10 or 15 years, that before the accident he was a hard-working man who enjoyed hunting and football, and that after the accident he was hospitalized, received emergency treatment in the hospital for two months, remained in a semi-comatose state in another hospital for four months, was treated in another hospital for three months, and then was moved again for inpatient rehabilitation in another hospital, until he made an improvement in his awareness. *Id.* at 832. Despite his awareness, the plaintiff was completely disabled: he does not have the ability to control his swallowing reflexes, which has led to complications, and further has resulted in a requirement that he be continually fed through a tube inserted into an opening in his abdominal cavity which leads directly to his stomach; he cannot control his speaking function and can only talk in guttural sounds; he has very limited use of his right arm and hand and left hand, and can only perform very elementary and perfunctory hygiene tasks, such as shaving and brushing his teeth; because of his limited ability to move, he has suffered continual problems associated with skin diseases and lung accumulations; he has no control over his bowel or bladder and must be fitted with an external catheter; he cannot play with his grandchildren; he may never taste food again; he will be confined to a wheelchair the rest of his life; and he will never be able to walk, work, or care for himself again. *Id.* at 832, 841. There was also evidence that the plaintiff would have $2.4 million in future medical expenses and $187,618.17 in lost future earnings. *Id.* at 845-46.

In *Walters v. May*, No. A-91-1282, 1993 WL 289484, at *5 (Neb. Ct. App. Aug. 3, 1993), the Nebraska Court of Appeals upheld a $55,000 verdict to a plaintiff motor cyclist who collided with the defendant's truck, where the plaintiff sustained over $14,000 in medical bills, he was unable to dress, feed, or bathe himself after he was dismissed from the hospital, he could walk only with a cane, and he required substantial physical therapy.

In *Vanskike v. Union Pac. R. Co.*, 725 F.2d 1146, 1149-51 (8th Cir. 1984), the Eighth Circuit Court of Appeals upheld a $1,811,177 jury verdict under Missouri law where the plaintiff's arm was pinned under a collapsed hitch, he was fully conscious for the forty-five minutes that it took to free his arm, he underwent several subsequent surgeries for amputation and stump repair, he could not use a prosthesis, he suffered extensive psychological and emotional problems, and he continued to experience severe pain from neuromas and phantom sensations.

A comparable award was issued in *Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1104, 1112 (8th Cir. 2014), where the Eighth Circuit held that an award of $2,284,888.20 for a plaintiff who sustained a disabling back injury at work was excessive, and properly remitted by the district court in the amount of $1,547,388.20.  *See also Carlson v. Bd. of Regents of the Univ. of Nebraska*, No. 4:09CV3213, 2011 WL 794437 at *1-2 (D. Neb. Mar. 1, 2011) (finding $280,000 verdict in Title VII retaliation claim excessive and remanding for a new trial); *Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1211 (8th Cir. 1999) (holding $220,000 award for emotional distress excessive as a matter of law, and that it was appropriately remitted by the district court).

In sum, each of the cases listed above demonstrate that the award in this case is so excessive as to shock the conscience.  At the outset, the jury wholly failed to consider Plaintiff's own negligence in rendering the award.  This failure is likely due to the improper conduct of

counsel in this case and their injection of bias and prejudice into the trial.  However, even if there was some basis upon which the jury could find that Plaintiff's own negligence did not contribute to his injuries, the award is still completely unsupported by the evidence in the case.  In fact, the actual or special damages alleged, including Plaintiff's purported past medical expenses, future living and medical expenses reduced to present value, past lost wages, and future lost wages when reduced to present value, is $4,680,420.46.  This means that the jury must have awarded Plaintiff the sum total of $14,927,065.54 for general damages.  This award is nearly five times that of the amount that Plaintiff sought in closing argument, when reduced to present value.

Defendants submit that this $14,927,065.54 award for pain and suffering is simply unsupported by the evidence, is plainly excessive, and is based upon passion, bias, sympathy, and undue prejudice to Defendants.  For this reason, Defendants are entitled to a new trial.  Furthermore, the Verdict, as a whole, is so grossly excessive as to shock the conscience.  Therefore, to the extent that this Court declines to grant Defendants a new trial, Defendants are entitled to a remittitur.  Any remittitur should be based solely upon the evidence before the Court.  Viewing that evidence as a whole, the Court should note that the absolute maximum amount of special damages that could be supported by the evidence, when reduced to present value, would be $4,680,420.46.  Furthermore, when viewing the record without the taint created by opposing counsel's improper conduct, it is clear that an appropriate reduction should be made for Plaintiff's own negligent conduct, to the extent this Court finds that it contributed to Plaintiff's own injuries.  For all of these reasons, Defendants respectfully request a new trial, or in the alternative, a remittitur.

## CONCLUSION

In the event that this Court finds that it has subject matter jurisdiction in this action, Defendants are entitled to a new trial, or at the very least, a remittitur.  Defendants are entitled to a new trial due to the improper conduct of Plaintiff's counsel in this case, which likely caused an excessive Verdict to be rendered on the basis of bias, passion, and undue prejudice.  Defendants are also entitled to a new trial due to several improper rulings that cumulatively resulted in prejudice to Defendants.  Finally, Defendants are entitled to a new trial because the Verdict is not supported by the evidence.  Alternatively, Defendants are entitled to a remittitur.

CONCRETE INDUSTRIES, INC.,
ROGER T. CLARKE and NEBCO, INC.,
Defendants

*s/ Terry C. Dougherty*
Terry C. Dougherty, No. 11064
WOODS & AITKEN LLP
301 South 13th Street, Suite 500
Lincoln, NE  68508
Telephone:  (402) 437-8525
Facsimile:  (402) 437-8558
E-mail:  tdougherty@woodsaitken.com

Attorney for Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of March, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Patrick J. Cullan                pat@cullanlaw.com
Joseph P. Cullan             j.cullan@cullanlaw.com
Daniel P. Lenaghan       dlenaghan@grosswelch.com

*s/ Terry C. Dougherty*
Terry C. Dougherty, #11064